THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN MONTEFOLKA, Defendant-Appellant.

First District (6th Division)   No. 1—95—2714

Opinion filed March 7, 1997.

THEIS, J., concurring in part and dissenting in part.

Gregory A. Adamski and Karen Conti, both of Adamski & Conti, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Sheila McGinnis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

Brian Montefolka (defendant) was convicted by a jury of home invasion, residential burglary and attempted aggravated criminal sexual assault. Defendant was sentenced to 10 years' imprisonment for home invasion, 7 years for residential burglary, and 10 years for attempted aggravated criminal sexual assault, to be served concur-

rently. Defendant appeals, raising issues as to whether: (1) the post-crime "showup" was unfairly suggestive; (2) the State should have been allowed to amend the home invasion count; (3) defendant was proven guilty of the offenses beyond a reasonable doubt; (4) the trial court erred in refusing defendant's *Telfaire* instruction (*United States v. Telfaire*, 469 F.2d 552 (D.C. Cir. 1972)); and (5) the State's comments during closing argument were improper. For the reasons that follow, we affirm in part and reverse in part.

The victim, Suzanne Bush (Bush), testified that she is 49 years of age and lives in Oak Forest, Illinois. On September 12, 1993, at approximately 4:30 a.m., Bush was sleeping in her upstairs bedroom when she was awakened by her dog's whining and went downstairs dressed in a nightshirt and underwear. Once downstairs, she observed defendant petting her dog. Although the interior of her home was not lighted, Bush was able to see defendant clearly in the light from neighboring homes.

Bush asked defendant who he was and what he was doing in her house. He identified himself as Bill Johnson and responded that he did not think she was home and that if she did not try anything, he would not hurt her.

Bush ignored this admonition and ran screaming to the front door. Defendant caught her at the door, placed her in a headlock and dragged her by the neck into the living room. Defendant threw her to the floor and a struggle ensued. Defendant's face was "inches" from her own.

During the struggle, defendant told Bush to take off her underwear. Bush continued to struggle, but the more she fought, the more defendant hurt her. Defendant continued choking her and again told her to take off her underwear. Bush again refused and the two continued to struggle.

Finally, Bush was able to engage defendant in conversation, asking him how and why he had broken into her home. Defendant responded that he needed money for his family and had entered through an unlocked window. Bush could smell alcohol and cigarettes on defendant's breath. She asked defendant if he would leave if she gave him some money. Defendant said "yes" and Bush gave him between $10 and $60 from the kitchen counter. Bush promised not to call the police and walked defendant to the front door, locking it upon his exit. ·

Bush then dressed and crossed to a neighbor's house, where the police were summoned. Bush described defendant to the police as a male, possibly Hispanic, 5 feet 4 inches tall, 150 pounds with dark hair, a light mustache and sideburns, and wearing a dark "White

Sox" T-shirt, brown leather jacket, baseball cap on backwards and blue jeans.

Approximately 40 minutes later, the police drove her to a house located a few blocks away in Oak Forest, where they believed they had located Bush's assailant. There was a party at the house and the police brought out eight male guests and walked each around the squad car. Before defendant reached the squad car, Bush identified him and noted that he was no longer wearing his leather jacket or baseball cap. Bush stated that defendant's face "was imbedded in her mind" and would be there for the rest of her life.

Bush returned to her house with the police, who began processing the scene for prints and other evidence. Bush identified pictures of her injuries, including bruises on her neck, arm, knees and shoulder, and blood by her ear, elbow and leg. On cross-examination, Bush testified that defendant did not touch her in a sexual manner, did not take off any of his own clothing, and did not display a weapon.

Shirley Matthay (Matthay), Bush's neighbor, testified that, on September 12, 1993, she was awakened at 4 a.m. by the dog next door. Looking out her bedroom window, she observed a dark red, two-door car parked in front of her house. As was her habit, Matthay went outside with a flashlight and took down the car's license plate number—UH 2900. Matthay then walked to the police station and reported the "suspicious" vehicle. When Matthay returned, the car was gone.

The Oak Forest police ran a computer check on the license number and discovered that the Mustang was registered to Domingo Montefolka, defendant's father. Officers were dispatched to the Montefolka residence located in the Village of Oak Forest.

Officers Quinn and Badoni arrived at the Montefolka residence and, as Quinn exited his vehicle, he observed a car turn onto Ridgeland Avenue, stop in the middle of the street, and then pull up in front of the house. The vehicle was a red Ford Mustang with license plate number UH 2900.

Quinn approached the driver, identified later as the defendant, and informed him that they were investigating some criminal activity that occurred earlier and that his car was possibly involved. Defendant told the officers that he had been at a party all evening and had loaned his car to Brian Wilson for approximately one half hour. Quinn described defendant as a male Hispanic with a light mustache and sideburns and dark hair who appeared short and weighed about 150 pounds. Defendant was wearing a black T-shirt with "White Sox" written on the front. Quinn did not observe a leather jacket or baseball cap.

Officers Quinn and Badoni and defendant each drove separately to the address which defendant gave as the location of the party he had attended. Defendant walked to the house ahead of the officers. Officer Quinn testified that defendant opened the door, rushed into the house and said, "The cops are here. I have been here all night no matter what. They got me on some shit I did earlier." Following this outburst, the officers handcuffed defendant and placed him in custody.

Quinn was present for the identification and observed defendant, along with eight other male party guests, walk in procession around the squad car in which Bush was seated. Bush immediately identified defendant as her assailant.

Daniel Hession hosted the party and testified that defendant had been at his home for approximately 30 minutes, around midnight, but had been asked to leave because he was "loud and obnoxious." Defendant returned to the party an hour or two later and was again asked to leave. Defendant was wearing jeans and a brown leather jacket.

Defendant was placed under arrest and "Mirandized" by Investigator Shaughnessy at approximately 6:30 a.m. on September 12, 1993. Defendant told Shaughnessy that he "did not do anything" and had left the party only to get cigarettes at around 2 a.m. Shaughnessy took defendant's fingerprints for comparison with the latent lifts he had taken from the scene. The fingerprint and other forensic evidence was inconclusive in terms of identifying defendant as Bush's attacker.

Following closing arguments, defendant was found guilty of home invasion, attempted aggravated criminal sexual assault, and residential burglary, and not guilty of robbery. Defendant argues initially that the trial court erred in denying his motion to suppress evidence of his identification, where the showup was unnecessary and unfairly suggestive.

Specifically, defendant contends that there was no exigent need for the showup and that the procedure employed was highly suggestive of defendant because no other participant was short and "possibly Hispanic." The State maintains that the immediate showup was necessary because the police were looking for a suspect within minutes of the home invasion, burglary and attempted sexual assault. The police were required to act promptly to determine whether defendant was the perpetrator or whether they needed to continue their search. Also, the form of the showup was not unnecessarily suggestive and had a high degree of reliability.

We must determine whether the trial court's decision denying defendant's motion to suppress identification evidence was manifestly

erroneous. *People v. Smith*, 274 Ill. App. 3d 84, 89 (1995). We note preliminarily that, although defendant and the trial court characterize the identification procedure as a showup or "hybrid," placing defendant in a group of similarly aged males more closely resembles a lineup. For purposes of our decision, however, this distinction is immaterial, and we will review the trial court's "hybrid" analysis.

■ An immediate showup near the scene of a crime can be proper. *Smith*, 274 Ill. App. 3d at 89; *People v. Manion*, 67 Ill. 2d 564 (1977). Only when a pretrial encounter resulting in identification is 'unnecessarily suggestive' or 'impermissibly suggestive' so as to produce 'a very substantial likelihood of irreparable misidentification' is evidence of that and any subsequent identification excluded under the due process clause. *Smith*, 274 Ill. App. 3d at 89; *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994). The decision whether to permit a showup identification is based on the following factors: " '[t]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " *People v. Poole*, 167 Ill. App. 3d 7, 14 (1988), quoting *Manion*, 67 Ill. 2d at 571; *Neil v. Biggers*, 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972).

■ In the present case, the facts demonstrate that Bush had ample opportunity to view defendant from a variety of angles. Defendant was facing Bush "at all times," including from such distances as nine inches. Bush engaged in extended conversation with defendant and was close enough to detect beer and cigarettes on his breath. She accompanied him into the kitchen and walked him to the front door.

Bush's description to the police was consistent and highly accurate, the crime and showup took place within an hour of each other, and Bush identified defendant out of a group of eight without hesitation, stating later that she would never forget his face. Bush's identification was inherently reliable and the trial court was correct to deny defendant's motion to suppress identification evidence.

■ Defendant argues next that the trial court erred by allowing the State to amend the home invasion count against defendant. An individual commits the offense of home invasion when

> "without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present and

\*\*\*

[i]ntentionally causes any injury to any person or persons within such dwelling place." 720 ILCS 5/12—11(a)(2) (West 1992).

■ The original grand jury indictment alleged that defendant was guilty of home invasion because he "knowingly entered 16026 S. Long, Oak Forest, Cook County, Illinois, the dwelling place of Suzanne B., when he knew or had reason to know that one or more persons are present and intentionally causes harm to any person or persons within such dwelling place." On May 4, 1994, over one year prior to defendant's trial, the State sought leave to amend the home invasion charge to reflect the alternative manner in which defendant committed the offense. The trial court, over defense objection, allowed the State to strike the phrase "when Brian Montefolka knew or had reason to know that one or more persons are present," adding in its place the phrase "and remained in 16026 S. Long until he knew or had reason to know that one or more persons was present."

The manner in which the offense is committed is a formal part of the indictment that can be amended pursuant to section 111—5 of the Code of Criminal Procedure. *People v. Coleman*, 49 Ill. 2d 565 (1971); 725 ILCS 5/111—5 (West 1992). Further, defendant cannot claim surprise or prejudice, since the amendment came a year before trial.

■ Defendant next argues that he was not proven guilty of home invasion, residential burglary and attempted aggravated criminal sexual assault beyond a reasonable doubt. The relevant inquiry on appeal is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49 (1989).

■ Defendant challenges the sufficiency of the home invasion count in its *pre*-amendment form, alleging that defendant did not enter the Bush residence knowing someone to be home. Since the count was properly amended to allege that defendant *remained* in the home after realizing Bush was present, and defendant undeniably did so, this argument is summarily rejected.

■ So too is defendant's challenge to the residential burglary charge. To sustain a conviction for residential burglary, the State is required to prove that defendant unlawfully entered the Bush residence with the intent to commit either a felony or theft therein. *People v. Monigan*, 204 Ill. App. 3d 686 (1990). In the present case, defendant was indicted for residential burglary with the intent to commit robbery. A person commits robbery when he takes property from the person or presence of another by use or threat of imminent force. 720 ILCS 5/18—1(a) (West 1992).

It is undisputed that defendant's entry into Bush's home was unlawful. When asked by Bush why he was in her home, defendant replied that "he needed money for his family." Defendant assaulted Bush and left with between $10 to $60 in cash. Viewing this evidence in a light favorable to the prosecution, the State has met its burden of proof. See *People v. Hopkins*, 229 Ill. App. 3d 665, 672 (1992) (intent can be proved by circumstantial evidence).

■ Of more merit is defendant's challenge to his conviction for attempted aggravated criminal sexual assault. A person commits criminal sexual assault if he "commits an act of sexual penetration by the use of force or threat of force." 720 ILCS 5/12—13(a)(1) (West 1992). The offense is aggravated where defendant caused bodily harm to the victim or when it was committed during the course of the commission or attempted commission of any felony by the accused. 720 ILCS 5/12—14(a)(2), (a)(4) (West 1992). An individual commits attempted aggravated criminal sexual assault when, with the intent to commit sexual assault, *he does any act that constitutes a substantial step toward the commission of sexual assault.* (Emphasis added.) 720 ILCS 5/8—4(a) (West 1992).

To sustain a conviction for attempted sexual assault, proof of specific intent to commit the offense of sexual assault is essential; however, such intent may be inferred from the circumstances of the assault. *People v. Beason*, 32 Ill. App. 3d 305 (1975). A defendant cannot be convicted of attempted aggravated criminal sexual assault absent evidence that he had taken a substantial step toward completion of the forced act of penetration. *People v. Webster*, 175 Ill. App. 3d 119 (1988).

■ After reviewing basic principles, we return to the specific facts of the case at bar. Bush found defendant on the first floor of her home and after an exchange of words, clad only in a nightshirt and underwear, ran to open the front door and escape. Defendant followed her to the door. The following testimony was elicited on direct examination:

"Q. What did you do?

A. I started to run and scream hysterically toward the front door *** I twisted the lock and tried to get the door open and he was on top of me by then, and we were fighting at the front door.

Q. When you say he was on top of you, what do you mean?

A. He was fighting with me *** he was trying to get my hand away from the door. And the next thing I knew he had me in a headlock and he dragged me into the front room by my small couch by the doorway and he had me to the side in a headlock with his hand around my neck and my head *** we just kept fighting. ***

Q. Suzanne, did you remain on your feet?

A. No, he had me on the ground. He had me with my knees out from underneath me and I was on the ground and he was fighting with me and struggling and fighting, and he told me to take off my underwear.

Q. When he had you on your knees in the dining room—or in the living room where was he in relation to you?

A. He was to my—the right of me. He was facing me. \*\*\* We kept fighting and struggling and I kept crying and screaming hysterically, please don't hurt me. Please, you're hurting me. And the more I struggled, the more I fought to get away, the more he hurt me and more he put his arms tighter around my neck choking me like that. And we fought for a while and then he told me to take off my underwear again.

Q. And when he told you to take your underwear off again, what did you say?

A. I told him no, there was no way. And we just kept fighting and fighting. And then finally I calmed down enough to be able to just sob."

On cross-examination, the following colloquy occurred:

"Q. Did he ever kneel on top of you and straddle over you?

A. Some type like that where he had his knees on top and he was around me.

Q. Were you flat on your back with him kneeling on top of you?

A. No, sir.

Q. During this entire seven to eight minutes while this struggle was going on did this person tear any of your clothing?

A. No, sir.

Q. Did he rip any of your clothing off?

A. No, sir. \*\*\*

Q. Did he attempt to lay on top of you?

A. No, sir.

Q. Did he attempt to touch or caress or fondle any parts of your body?

A. No, sir.

Q. Ma'am, did he start to take his clothes off?

A. No, sir. \*\*\*

Q. Did he expose himself in any way?

A. No, sir." ·

This is all of the testimony presented to the jury relating to attempted sexual assault. We observe initially that the State, in its brief to this court, misrepresents this testimony, claiming that defendant "threw her to the ground and straddled her with his knees on top of hers, pinning her down" "while continually demanding that she take off her underwear."

The only overtly sexual aspects of defendant's conduct were his two requests that Bush remove her underwear. He made no overt act toward her genitals, did not use force to remove her clothing, nor did he expose himself. Bush acknowledges that defendant did not touch, caress or fondle any part of her body. Certainly, defendant was in a position, literally, to go further than simply asking her to remove her underwear. However, the issue is whether defendant's conduct constituted a substantial step toward the commission of aggravated sexual assault. While defendant's conduct is reprehensible, precedent suggests that he did not.

In a factually similar case, *People v. Rayfield*, 171 Ill. App. 3d 297 (1988), the court reversed defendant's attempted sexual assault conviction, finding defendant's acts of unlawfully entering the victim's apartment, struggling with the victim, who was wearing a nightgown, threatening to kill her if she continued to scream, carrying her toward the bedroom and asking to see her vagina did not constitute a substantial step toward sexual assault. *Rayfield*, 171 Ill. App. 3d at 299-300.

Similarly, in *People v. Pitts*, 89 Ill. App. 3d 145 (1980), the court reversed a jury conviction on attempted aggravated sexual assault where an inmate assaulted a female prison guard, straddled her, threatened to kill her, felt her breasts and pawed at her pants before gyrating upon her until he experienced orgasm. In reversing defendant's conviction, the *Pitts* court found defendant did not make a substantial step toward sexual penetration because he made no overt move toward the victim's "genital area" and did not expose himself. *Pitts*, 89 Ill. App. 3d at 147. Unlike the case at bar, the *Pitts* defendant made overt sexual movements toward complainant and initially attempted to disrobe her.

Our supreme court reversed a similar conviction, finding defendant's acts of driving victim to a remote area against her will, kissing her, announcing his intention to have sexual intercourse with her, covering her mouth and chasing her through a field did not amount to attempted rape. *People v. Bush*, 19 Ill. 2d 151 (1960). This 36-year-old case seems out of touch with the views of modern courts and legislatures relating to crimes of sexual assault and abuse. It parrots old cliches from an era when a corroborating witness was necessary to sustain a rape conviction. While we note this supreme court case, we do not rely upon it to reverse defendant's conviction.

Recently, in *People v. Jones*, 175 Ill. 2d 126 (1997), the supreme court considered an attempted aggravated criminal sexual abuse conviction. In *Jones*, the defendant was alleged to have " 'performed a substantial step toward the commission of that offense, in that he

disrobed in the presence of [D.R.], who was at least 13 years of age but under 17 years of age at the time, stimulated his [own] penis to erection and requested the said [D.R.] to masturbate him to orgasm, for the purpose of the sexual gratification of the defendant; and that said defendant was at least 5 years older than [D.R.].' " 175 Ill. 2d at 129.

The majority found:

> "After careful consideration, we agree with the appellate court that this act of exposure, when added to the request for sexual conduct, was sufficient to constitute a substantial step notwithstanding the lack of any actual contact between defendant and the victim. 276 Ill. App. 3d at 1008-09, citing *People v. Brewer*, 118 Ill. App. 3d 189 (1983). We therefore believe the evidence at trial was sufficient for the jury to conclude that defendant was guilty beyond a reasonable doubt ***." 175 Ill. 2d at 134.

The conduct at issue in *Jones* is readily distinguishable from defendant's conduct in the present case. Here, defendant made no attempt to disrobe himself or Bush. Thus, we do not have "an act of exposure" coupled with "a request for sexual conduct." We have only defendant's request that Bush remove her underwear.

Defendant's conduct, within the context of the above-cited cases, does not appear to qualify as a substantial step toward commission of sexual assault. Our case is quite similar to *Rayfield*, since both cases involved unlawful entry, physical assault, victims wearing nightgown/nightshirt, requests to see the victim's vagina or for victim to remove her underwear, followed by conversation and relatively nonthreatening parting of ways.

The well-intentioned dissent attempts to distinguish *Rayfield*; however, in so doing, the author neglects to mention that the *Rayfield* defendant required that he be allowed to "hold" the frightened victim, threatened to kill her if she screamed and then carried her toward the bedroom before he put her down and subsequently conversed with her on the couch. *Rayfield*, 171 Ill. App. 3d at 298-99. The notion that the *Rayfield* defendant made a calm, nonthreatening sexual suggestion moments after threatening to kill her is a unique characterization of the defendant's conduct.

The dissent neglects to observe that, in *Rayfield*, the defendant left only after the victim repeatedly advised him that her boyfriend was expected. *Rayfield*, 171 Ill. App. 3d at 299. Even more curious is the dissent's conclusion that the *Rayfield* defendant did not demand that the victim disrobe. It is reasonable to inquire how the victim was expected to allow the defendant to "see her vagina" without partially disrobing. The totality of the *Rayfield* circumstances do not reasonably vary from those of the instant case.

Moreover, cases finding defendant's conduct culpable seem to be based on far more overt and violent sexual and related physical acts. See *People v. Sutton*, 252 Ill. App. 3d 172 (1993) (punching, choking and threatening handicapped victim while pulling her pants off and attempting to remove his own); *People v. Kleba*, 110 Ill. App. 3d 345 (1982) (acts of defendant in knocking complainant to the ground, repeatedly threatening to kill her, holding her neck in an immobilizing arm-lock and dragging her into an alley, ordering her to remove her jeans and underwear and then bend over and clasp her ankles, whereupon he began fondling her vagina, constituted a substantial step toward commission of the offense).

Limited by the thrust of these cases, it appears that defendant's conduct, even in the light that most favors the prosecution, was not a substantial step toward an act of sexual penetration. We find that defendant was not proven guilty of the offense beyond a reasonable doubt. We observe that our finding will not affect defendant's sentence, since the attempted aggravated sexual assault term is concurrent with the 10-year term for home invasion, and we see no reason to remand for resentencing.

■ Defendant continues to argue that the trial court erred in declining to submit defendant's *Telfaire* instruction. In *Telfaire*, the United States Court of Appeals suggested the use of several instructions to prevent the danger of mistaken identification as a threat to justice. *Telfaire*, 469 F.2d at 555. However, Illinois courts have consistently held that refusal to give a *Telfaire* instruction is proper when the jury receives adequate pattern jury instructions. See *People v. Masse*, 237 Ill. App. 3d 348 (1992); *People v. Benson*, 71 Ill. App. 3d 591, 594 (1979) (and cases cited therein).

In the present case, the jury was thoroughly instructed on the identification issues, and the identification itself, contrary to defendant's repeated assertions, was altogether reliable. The trial court did not err in refusing the instruction.

■ Lastly, defendant claims the following remarks, made by the prosecution in closing argument, were improper:

> "Ladies and gentlemen of the jury, I must apologize, because you know now after hearing that closing argument, we have been discovered. You now know as you sit there today that myself and Assistant State's Attorney Tom Byrne and just about every member of the Oak Forest police department and Suzanne Bush and Shirley Matthay and every witness in this room conspired to convict Brian Montefolka.
>
> You now know the most incredible conspiracy in the history of Cook County has been concocted in order to convict this individ-

ual. You now know on September 12, 1993, we all got together and sat around in Oak Forest and said, who should we pick out of the air to charge with these crimes. And guess who we picked. The defendant, Brian Montefolka. That's the defense in this case. That defense is ludicrous. *** Because this is a conspiracy, that's embarrassing, that defense, humiliating."

Prosecutors are afforded wide latitude in making closing arguments, and the decision to allow certain remarks falls within the sound discretion of the trial court. *People v. Brooks*, 246 Ill. App. 3d 777, 788 (1993). In addition to discussing the evidence and any reasonable inferences therefrom, a prosecutor may respond to comments made by defense counsel that invite or provoke such a response. *Brooks*, 246 Ill. App. 3d at 788.

The prosecutor's remarks, though inappropriate, were arguably invited by defense counsel's earlier argument implying that a conspiracy existed to convict defendant. Specifically, defense counsel suggested that testimony was fabricated or embellished and that forensic evidence was "explained away" or simply missing. Defense counsel also, and rightfully so, objects to the characterization of his defense as "ludicrous *** embarrassing *** humiliating."

Improper closing remarks will only warrant reversal of a criminal conviction where such remarks result in substantial prejudice to the defendant. *People v. Smith*, 141 Ill. 2d 40, 60 (1990). Substantial prejudice occurs where the remarks constitute a "material factor" in the conviction such that the jury may have reached an opposite result had the remarks not been made. *People v. McCall*, 190 Ill. App. 3d 483, 493 (1989). In the present case, the prosecutor's remarks were not a material factor in the jury's decision, and we find any error to be harmless.

For the reasons set forth above, we affirm defendant's convictions for home invasion and residential burglary and reverse his conviction for attempted aggravated criminal sexual assault.

Affirmed in part and reversed in part.

ZWICK, J., concurs.

JUSTICE THEIS, specially concurring in part and dissenting in part:

I must dissent from the majority's determination that the State failed to prove beyond a reasonable doubt that defendant's conduct was a substantial step toward the act of sexual assault.

The majority accurately states the standard of review we must

apply to defendant's challenge to the sufficiency of the evidence. Because inferences drawn from the evidence are well within the province of the jury, we must not substitute our judgment for the jury's with regard to the weight of the evidence or credibility. *People v. Jordan*, 282 Ill. App. 3d 301, 668 N.E.2d 90 (1996). Reversal is inappropriate "unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Campbell*, 146 Ill. 2d 363, 375, 586 N.E.2d 1261, 1266 (1992).

The majority seeks guidance from *People v. Bush*, 19 Ill. 2d 151, 166 N.E.2d 91 (1960), and *People v. Pitts*, 89 Ill. App. 3d 145, 411 N.E.2d 586 (1980), while acknowledging that the holdings are "out of touch." 287 Ill. App. 3d at 209. These opinions are not merely antiquated, they are entirely inapposite. The *Bush* decision involves a repealed rape statute, which required corroborating witness testimony to prove intent to forcefully engage in intercourse. *Bush*, 19 Ill. 2d at 154, 166 N.E.2d at 93. Similarly, the court in *Pitts* acknowledged that it was bound by a 1961 definition of rape which penalized only forcible sexual intercourse. *Pitts*, 89 Ill. App. 3d 145, 411 N.E.2d 586.

The sexual assault statute, however, criminalizes the act of forcible sexual penetration. The broadness of the term "sexual penetration" highlights the incompatibility of the attempted rape cases to the instant case. See 720 ILCS 5/12—13(a)(1) (West 1992). While the majority neglects to set forth the term "sexual penetration," the scope of culpable conduct is critical to the appropriate resolution of this case. Sexual penetration means:

> "[A]*ny contact*, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or *any intrusion, however slight, of any part of the body* of one person or of any *** object into the sex organ or anus of another ***." (Emphasis added.) 720 ILCS 5/12—12(f) (West 1992).

"[T]he statutory definition does not require physical penetration but merely requires contact." *People v. Moore*, 199 Ill. App. 3d 747, 773, 557 N.E.2d 537, 555 (1990), *appeal denied*, 133 Ill. 2d 567, 561 N.E.2d 701 (1990), *cert. denied*, 498 U.S. 1031, 112 L. Ed. 2d 681, 111 S. Ct. 690 (1991). Therefore, unlike *Bush* or *Pitts*, we need not find evidence that defendant intended to engage in sexual intercourse. Rather, reversal of defendant's conviction is inappropriate if any rational trier of fact could infer that the defendant intended to: (1) contact the victim's sex organ with his sex organ or mouth; or (2) make "any intrusion" with "any part of [his] body" into the victim's sex organ. 720 ILCS 5/12—12(f) (West 1992).

In spite of the broadness of the sexual assault statute, the majority trespasses upon the province of the jury and reverses defendant's conviction. The majority relies heavily upon *People v. Rayfield*, 171 Ill. App. 3d 297, 525 N.E.2d 253 (1988), for reversal, noting that both cases involved unlawful entry, physical assault, sexual suggestions, conversation, and the defendant's nonviolent departure. The critical distinction between *Rayfield* and the instant case, however, involves the circumstances surrounding the sexual suggestion.

In *Rayfield*, after a struggle, the victim was able to calm the assailant. The two sat on the victim's couch and engaged in conversation. The defendant got up to leave, but before he left the apartment he asked the victim if he could see her vagina. The victim refused and the assailant made no attempt to force the victim to comply with his request. Of significance is the *Rayfield* court's reliance upon the fact that not only did the assailant not disrobe, he did not demand that the victim disrobe either. The lack of an attempt to expose either party, coupled with a nonviolent sexual suggestion, tends to support the court's conclusion that there was a reasonable doubt as to whether the assailant took a substantial step toward committing criminal sexual assault.

Conversely, the defendant in this case knocked the victim to the floor and ordered her to take off her underwear. She struggled, begging him not to hurt her. The defendant choked the victim, repeating his demand to disrobe. She again refused and continued to fight him. During the struggle, the victim persuaded the defendant to take her money and leave. Unlike the assailant in *Rayfield*, the defendant made a demand to disrobe, which was coupled with contemporaneous violence. These facts support the jury's conclusion that the defendant intended to contact the victim's sex organ in some manner. It is irrelevant that the defendant did not disrobe, as the act of sexual penetration is not contingent upon the defendant being exposed.

I believe the majority can find little solace in the Illinois Supreme Court's recent decision in *People v. Jones*, 175 Ill. 2d 126 (1997). In *Jones*, the supreme court affirmed the jury's finding of attempted aggravated criminal sexual abuse where the defendant never touched his victim or restricted the victim's ability to leave the room. The court acknowledged the jury's right to infer intent from the defendant's exposure of his genitals coupled with a sexual suggestion, even in the absence of force or physical contact. The *Jones* decision in no way restricts the court's previous holding in *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988), where the Illinois Supreme Court stated that "[e]vidence of an assault with concomitant disrobing of the victim is sufficient to support a conviction for attempted rape."

*Enoch*, 122 Ill. 2d at 198, 522 N.E.2d at 1135. The facts in the instant case satisfy this criteria.

While I join in the majority opinion as it pertains to all other issues raised on appeal, I cannot agree that this violent attack coupled with the demand to disrobe is evidence "so unreasonable, improbable, or so unsatisfactory" as to justify reversal of the jury's verdict.