NOTICE

Decision filed 10/10/06. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-05-0063

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
                                       ) Circuit Court of
    Plaintiff-Appellee, ) Saline County.
                                         )
v. ) No. 04-CF-275
                                         )
JERRY GRATHLER, ) Honorable
                                         ) Brocton Lockwood,
    Defendant-Appellant. ) Judge, presiding.

_____

      JUSTICE HOPKINS delivered the opinion of the court:

      On appeal from his convictions for residential burglary (720 ILCS 5/19-3(a) (West 2004)) and attempted aggravated criminal sexual assault (720 ILCS 5/8-4(a), 12-14(a)(4) (West 2004)), the defendant, Jerry Grathler, argues that the State failed to prove his guilt beyond a reasonable doubt. We affirm.

BACKGROUND

      On July 9, 2004, the defendant was arrested and charged with one count of residential burglary (720 ILCS 5/19-3(a) (West 2004)) and one count of attempted aggravated criminal sexual assault (720 ILCS 5/8-4(a), 12-14(a)(4) (West 2004)). The residential burglary charge alleged that the defendant had unlawfully entered C.F.'s home "with the intent to commit therein an aggravated criminal sexual assault"; the attempt charge alleged that the criminal sexual assault was aggravated because it had been attempted "during the commission of a residential burglary." See 720 ILCS 5/12-14(a)(4) (West 2004). On December 14, 2004, the cause proceeded to a bench trial, where the following evidence was adduced.

      C.F. testified that she lived alone in a small house in Carrier Mills and was an

experienced social worker with specialized training in matters related to violent crime and law enforcement. On July 9, 2004, at approximately 1 a.m., C.F. was awakened in her bed by the barking of her two small dogs. When she was unable to silence the dogs, she walked into the hallway of her home and saw "a very large figure" in her kitchen. Startled, C.F. let out "kind of a yelp." The figure then approached C.F., and she saw that it was the defendant. C.F. testified that she "immediately recognized" the defendant because he grew up in her grandparents' neighborhood.

The defendant was wearing a sweatshirt from C.F.'s basement and "carpenter jeans with no socks and no shoes." The defendant was holding a thin rope and a long leather purse strap, and he came at C.F., grabbing at her hands. Employing tactics learned during the course of her career, C.F. kept her hands above her chest, referred to the defendant by his first name, and tried to "make a connection" with him and "act like everything was okay." As the defendant grabbed her and tried to pull her near, C.F. "kept pulling away and saying no." C.F. then backed into her living room, where the defendant followed her, lunged down onto one of her two couches, and repeatedly tried "to pull [her] on top of him." The defendant grabbed at C.F.'s waist and "buttocks area" while trying to force her down. C.F. was wearing a nightgown, and she feared that the defendant was going to sexually assault her. As she struggled, C.F. continued to talk to the defendant and convince him that he did not "want to do this." C.F. eventually managed to sit herself down on the couch across from the couch where the defendant was sitting. C.F. testified that a coffee table stood between the couches, and she wanted to engage the defendant in further conversation from a safe distance, in a nonthreatening manner.

C.F. testified that the defendant had an odor of alcohol about him but was "focused" and "able to answer questions" and "seemed to be thoughtful." When C.F. asked the defendant if he was "on something," he indicated that he was not. When C.F. asked the

2

defendant why he was there, the defendant said that "he had seen [her] around and he found [her] sexually attractive" and that "he thought, well‒"; the defendant then mumbled something indiscernible, and C.F. immediately diverted the conversation "to something else." When C.F. asked the defendant if anyone was with him, he advised that he was alone, and after announcing her intention to do so, C.F. quickly grabbed her robe from her nearby bedroom and covered herself with it. She then returned to the couch and continued to converse with the defendant. As the defendant spoke with C.F., he fidgeted with the rope in his hands, "maintaining off and on eye contact." At one point, C.F. falsely claimed that her "ex-husband should be by any time." The defendant apologized several times and indicated that he was probably "going to be in trouble." Meanwhile, one of C.F.'s dogs had jumped onto her bed and was barking because it was unable or afraid to get down by itself. When C.F. noticed that the barking was "distracting" and "bothering" the defendant, she used the dog as an excuse to return to her bedroom, stating that she "better get that dog because if it falls off the bed it's going to hurt itself." Continuing her conversation with the defendant as she moved, C.F. went into her bedroom, grabbed the dog off the bed, took the bedroom telephone off the hook, and dialed 9-1-1. She then returned to the living room carrying the dog. Soon thereafter, C.F. claimed that she saw a car in front of her house and acted as if the car might be her ex-husband's. She then walked to the front door, opened it, and saw a police car outside. At that point, she told the defendant that the police were there and she "ran out the door."

Officer Mike Stover of the Carrier Mills police department testified that, on July 9, 2004, at approximately 1:50 a.m., he responded to an "open line" 9-1-1 call from C.F.'s residence in Carrier Mills. When Officer Stover drove by, he saw C.F. standing at the door talking to someone. When Officer Stover subsequently parked his patrol car in front of the house, C.F. exited the house looking frightened and hurried toward him. After C.F.

3

recounted what had occurred, Officer Stover searched her home, but the defendant was gone.

Officer Stover's investigation revealed that the defendant had entered C.F.'s home through a basement window. The window's screen had been removed, and the window itself had been pried and pushed open. The rope that the defendant had been holding, which was tied "like a slipknot," was found on the floor in front of the couch where the defendant had been sitting. The leather purse strap that the defendant had been holding was found on the floor of the kitchen. In the basement, a leather purse with its straps cut off was found in an area where "a lot of the stuff had been moved." A television cable wire had been pulled from somewhere and was also "out of place." A black string attached to a silver ring was found near a table where a pair of size 14, black, laced tennis shoes was also discovered. A white T-shirt tied in a knot was found lying on top of C.F.'s washing machine. C.F. testified that the tennis shoes and T-shirt were not hers and had not previously been in her basement.

When Officer Steven Sloan arrived to assist Officer Stover, they canvassed C.F.'s neighborhood looking for the defendant. The defendant's car was found parked a few blocks away from C.F.'s house, and early into the search, someone was observed approaching and then running away from the car. At approximately 4:30 a.m., the defendant was apprehended at his grandmother's house, where he was found asleep on her porch. When arrested, the defendant stated that "all [he had] done was open the window." After later waiving his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) at the Saline County jail, the defendant claimed that he did not remember anything. When subsequently advised of the charges against him, he stated that, after consuming eight or nine beers and some methamphetamine, he entered C.F.'s home so that he could get something to drink. The defendant claimed that, when C.F. confronted him, she started screaming and he grabbed hold of her hands. The defendant said that "he was wrong for being there" and that he exited out the back door when the police arrived. The defendant acknowledged that he

4

was sexually attracted to C.F.

Defense witness Mary Johnson testified that, on July 8, 2004, she lived in Carrier Mills with her son Danny Sherfield. Sometime between 7 p.m. and 8 p.m. that evening, the defendant stopped by to visit Danny. Johnson stated that the defendant had a 12-pack of beer with him and "was already drunk." The defendant and Danny hung out on Johnson's front porch drinking beer until 11:30 p.m., at which point Johnson ordered Danny to bed because he had to work the next morning. Johnson told the defendant that he could either sleep at her place or leave. The defendant indicated that he was going to stay at his grandmother's house and then drove off. On July 9, at approximately 2 a.m., Officer Sloan came to Johnson's door looking for the defendant; Officer Sloan had seen the defendant's car in front of Johnson's house the night before.

The defendant testified that, on the evening of July 8, he picked up a 12-pack of beer, drank 3 or 4 of the beers, and went to visit his friend Danny Sherfield. The defendant stated that, while visiting Danny, he finished the 12-pack and then drank several of Danny's beers. The defendant recalled leaving but could not remember what he did after that. The next thing he remembered was waking up in a basement "[b]y a rope strangling [him]." The defendant then proceeded upstairs, where he encountered C.F. When C.F. yelled, he became confused and grabbed her hands. The defendant claimed that he apologized and that he then stumbled to a couch where he and C.F. conversed. The defendant claimed that he "was blacking in and out" but denied making any kind of sexual advances toward C.F. Other than when he initially grabbed at C.F.'s hands, he did not remember grabbing or pulling her at any other time. The defendant testified that he "[k]ind of" remembered C.F. from high school, but "[s]he was a couple of years older." The defendant could not recall how he had entered C.F.'s home. The defendant explained that he ultimately ended up asleep on the back porch of his grandmother's house, which was about six blocks away, but did not know how he got

5

there.  The defendant denied cutting the strap off the purse found in the basement and claimed that he did not know from where the rope or the black string with the ring had come.  The defendant indicated that his statements to the police were the false results of coercion, but he admitted taking methamphetamine on July 7.  The defendant testified that methamphetamine "put[s] [him] out of [his] state of mind."  The defendant further testified that he did not know if the shoes and shirt found in C.F.'s basement belonged to him, but he acknowledged that he wore size 13 shoes and that, when arrested, he was not wearing any shoes.  The defendant maintained that he had not entered C.F.'s home "with the specific intent to do anything wrong."

Noting that the defendant conveniently remembered some things but not others, the trial court described the defendant's assertion that he "periodically blacked out" as "somewhat curious."  The court further observed that the defendant's "physical conduct" was inconsistent with "the level of his claimed impairment."  By contrast, the trial court found that C.F. was not only "very credible" but also one of the most "impressive" witnesses that it had ever seen.  The trial court stated that it was "confident that her recollections were accurate."  The trial court found the defendant guilty on both counts and later imposed concurrent six-year prison sentences.  The present appeal followed.

ANALYSIS

The defendant's sole contention on appeal is that his convictions for residential burglary (720 ILCS 5/19-3(a) (West 2004)) and attempted aggravated criminal sexual assault (720 ILCS 5/8-4(a), 12-14(a)(4) (West 2004)) must be reversed because the State failed to prove his guilt beyond a reasonable doubt.

"A reviewing court will not set aside a criminal conviction on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt.  When considering the sufficiency

6

of the evidence, it is not the function of a reviewing court to retry the defendant. Rather, the relevant question is whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational fact finder could have found beyond a reasonable doubt the essential elements of the crime." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001).

When establishing the essential elements of a crime beyond a reasonable doubt, "[t]he State is not required to exclude every reasonable hypothesis of innocence." *People v. Rush*, 294 Ill. App. 3d 334, 337 (1998).

Residential Burglary

The defendant first argues that his residential burglary conviction must be reversed because the State failed to prove that he entered C.F.'s home with the intent to commit criminal sexual assault.

The parties agree that, to prove its residential burglary charge, the State was required to prove that the defendant unlawfully entered C.F.'s home with the intent to commit an act of criminal sexual assault. The State was therefore required to prove that the defendant entered with the intent to commit "an act of sexual penetration by the use of force or threat of force." 720 ILCS 5/12-13(a)(1) (West 2004). " 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth[,] or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio[,] or anal penetration." 720 ILCS 5/12-12(f) (West 2004). "Whether the requisite intent existed is a question for the trier of fact, whose determination will not be disturbed on review unless a reasonable doubt exists as to the defendant's guilt." *Maggette*, 195 Ill. 2d at 354.

"[I]ntent may be inferred by surrounding circumstances and may be proved by

7

circumstantial evidence." *People v. Taylor*, 344 Ill. App. 3d 929, 936 (2003). "In a burglary case, the relevant surrounding circumstances include the time, place[,] and manner of entry into the premises, the defendant's activity within the premises, and any alternative explanations offered for his presence." *People v. Richardson*, 104 Ill. 2d 8, 13 (1984). "Circumstantial evidence is the proof of certain facts and circumstances from which the [trier of fact] may infer other connected facts which usually and reasonably follow according to the common experience of mankind." *Hartness v. Ruzich*, 155 Ill. App. 3d 878, 882 (1987). "The sole limitation on the use of circumstantial evidence is that the inferences drawn therefrom must be reasonable." *Ruzich*, 155 Ill. App. 3d at 883.

Here, viewing the evidence adduced at the trial in the light most favorable to the State, we conclude that it was reasonable for the trial court to find that the defendant entered C.F.'s home with the intent to commit an act of criminal sexual assault. A rational trier of fact could find that, emboldened by the effects of alcohol and methamphetamine, the defendant surreptitiously broke into C.F.'s basement in the middle of the night, when C.F. would likely be asleep and vulnerable upstairs in her bed. Once inside C.F.'s home, the defendant rummaged through her basement in search of items that he could use as bindings, possibly abandoning the notion to use his T-shirt and shoestrings for that purpose. When the defendant proceeded upstairs, he was holding a thin rope tied "like a slipknot" and a long purse strap, both of which could have been used to bind C.F.'s hands or otherwise physically restrain her. When confronted, the defendant set upon C.F., ignoring her resistance and pleas of "no." The defendant made repeated attempts to seize C.F.'s hands and, when seated on the couch, "to pull [her] on top of him." The defendant grabbed at C.F.'s waist and "buttocks area." The defendant stated that he was there because "he had seen [C.F.] around and he found [her] sexually attractive" and "he thought, well–." The defendant's flight from the police could be construed as demonstrating his consciousness of guilt (see *People v. Lewis*,

8

165 Ill. 2d 305, 349 (1995)), as could his varying statements to the police (see *People v. Milka*, 211 Ill. 2d 150, 181 (2004)) and his apologies to C.F.

Although at the trial the defendant offered extreme intoxication as an alternative explanation for his actions and presence, the trial court found that the defendant's testimony was not credible. As the State suggests on appeal, the trial court could have reasonably concluded that the defendant's conduct "spoke loudly about what his intentions were." Accordingly, we will not disturb the trial court's determination that the defendant entered C.F.'s home with the intent to commit an act of sexual penetration by the use or threat of force. *Cf. People v. Toolate*, 101 Ill. 2d 301, 303, 305, 306 (1984) (reversing the defendant's conviction for "residential burglary with intent to commit rape" where the defendant's conduct was "inconsistent with those of a would-be rapist" and failed to support "the inference that he entered the [victim's] apartment with an intent to have sexual intercourse with [the victim] by force and against her will").

Attempted Aggravated Criminal Sexual Assault

To prove its attempted aggravated criminal sexual assault charge, the State was required to prove that, with the intent to commit criminal sexual assault, the defendant did "any act which constitutes a substantial step toward the commission of that offense" (720 ILCS 5/8-4(a) (West 2004)) and did so during the course of a residential burglary (720 ILCS 5/12-14(a)(4) (West 2004)).

"An attempt crime is one 'that falls short of completion through means other than the defendant's voluntary relenting.' " *People v. Hawkins*, 311 Ill. App. 3d 418, 427 (2000) (quoting *People v. Dogoda*, 9 Ill. 2d 198, 203 (1956)). An attempt is committed when a defendant crosses "the line where preparation ends and actual execution of a criminal act begins," and "subsequent abandonment of the criminal purpose is no defense." *Hawkins*, 311 Ill. App. 3d at 426, 424. "A person commits an attempt when, with intent to commit a

9

specific offense, he does any act which constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2004). "Precisely what is a substantial step must be determined by evaluating the facts and circumstances of each particular case." *People v. Smith*, 148 Ill. 2d 454, 459 (1992).

"Illinois courts have relied on the Model Penal Code for guidance in determining whether an accused has taken a substantial step toward commission of a crime." *Hawkins*, 311 Ill. App. 3d at 424; see also *People v. Terrell*, 99 Ill. 2d 427, 435-36 (1984). Under section 5.01(1)(c) of the Model Penal Code, an attempt to commit a crime occurs when an individual with the requisite intent performs any act "constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Model Penal Code §5.01(1)(c), at 296 (1985). Section 5.01(2) of the Model Penal Code provides:

"Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:

(a) lying in wait, searching for[,] or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle[,] or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection[,] or fabrication of materials to be employed in the

10

commission of the crime, at or near the place contemplated for its commission, if such possession, collection[,] or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime." Model Penal Code §5.01(2), at 296 (1985). As this list demonstrates, "[t]he approach of the Model Penal Code is to concentrate on the steps a defendant has taken toward the commission of the crime rather than on what steps remain." *People v. Jiles*, 364 Ill. App. 3d 320, 334 (2006); see also *Hawkins*, 311 Ill. App. 3d at 424.

Citing *People v. Montefolka*, 287 Ill. App. 3d 199 (1997), the defendant argues that his attempted aggravated criminal sexual assault conviction must be reversed because the State failed to prove that he took a substantial step toward the commission of a criminal sexual assault. In *Montefolka*, stating that "[a] defendant cannot be convicted of attempted aggravated criminal sexual assault absent evidence that he had taken a substantial step toward completion of the forced act of penetration," the Sixth Division of the First District Appellate Court held that evidence that the defendant struggled with the victim and twice told her to remove her underwear was insufficient to sustain the defendant's conviction for the offense. *Montefolka*, 287 Ill. App. 3d at 207-11. When considering the sufficiency of the evidence, the *Montefolka* court noted, *inter alia*, that the defendant "made no overt act toward [the victim's] genitals, did not use force to remove her clothing, nor did he expose himself." *Montefolka*, 287 Ill. App. 3d at 209. Justice Theis dissented "from the majority's determination that the State failed to prove beyond a reasonable doubt that defendant's conduct was a substantial step toward the act of sexual assault" and maintained, *inter alia*, that the cases upon which the majority relied were "antiquated" and "entirely inapposite." *Montefolka*, 287 Ill. App. 3d at 212, 213 (Theis, J., dissenting).

11

*Montefolka*'s attempted aggravated criminal sexual assault holding has since been criticized and called into doubt.

In *People v. Cosby*, 305 Ill. App. 3d 211, 215-16 (1999), the defendant demanded sex from the victim, beat and shot her during an ensuing struggle, and then fled. On appeal from his various convictions, the defendant relied on *Montefolka* when arguing that his attempted aggravated criminal sexual assault conviction could not stand "because there was no showing that he removed his clothing or that of the victim or made any genital contact with her." *Cosby*, 305 Ill. App. 3d at 221. After distinguishing *Montefolka* on its facts, the Second Division of the First District Appellate Court stated, "[E]ven if *Montefolka* was not factually distinguishable, we would respectfully decline to follow it." *Cosby*, 305 Ill. App. 3d at 222. Agreeing with Justice Theis's assessment that the majority's holding in *Montefolka* was derived from outmoded law, the *Cosby* court held that, in light of the evidence that the defendant intended to have sex with the victim, his "attack on the victim constituted a substantial step toward the commission of the offense of aggravated criminal sexual assault." *Cosby*, 305 Ill. App. 3d at 224.

In *People v. Hawkins*, 311 Ill. App. 3d 418, 429 (2000), when affirming the defendant's attempted criminal sexual assault conviction, the Fourth District Appellate Court described *Montefolka*'s attempted aggravated criminal sexual assault holding as "logically unsound and a dangerous precedent." The *Hawkins* court stated: "We find [the *Montefolka* majority's] emphasis on what the defendant did *not* do to be an inappropriate test for determining whether a substantial step was taken. Moreover, such a test is inconsistent with the Model Penal Code. A substantial step can be the very first step beyond mere preparation. That more steps could conceivably have been taken before actual commission of a crime does not render that first step insubstantial." (Emphasis in original.) *Hawkins*, 311 Ill. App. 3d at 428.

12

In *People v. Scott*, 318 Ill. App. 3d 46, 54 (2000), the Second District Appellate Court noted that "*Montefolka* may not be good law." After discussing *Hawkins*, the *Scott* court determined that the defendant had taken "a substantial step" toward committing the offense of predatory criminal sexual assault of a child by first arranging to meet with who he thought was a 12-year-old boy ostensibly willing to engage in acts of sexual penetration (thereby satisfying factor (b) of section 5.01(2) of the Model Penal Code) and then driving to the agreed-upon location at the agreed-upon time. *Scott*, 318 Ill. App. 3d at 49, 54-55.

Finally, in *People v. Childress*, 321 Ill. App. 3d 13 (2001), the Second Division of the First District Appellate Court again rejected a claim that, in accordance with *Montefolka*, a defendant's attempted aggravated criminal sexual assault conviction had to be reversed because "his acts did not constitute a substantial step toward commission of 'an act of sexual penetration.' " *Childress*, 321 Ill. App. 3d at 24-25 (quoting 720 ILCS 5/12-13(a)(1) (West 1998)). After finding *Montefolka* "factually distinguishable," the *Childress* court noted that, in *Cosby*, it had "expressly declined to follow *Montefolka*." *Childress*, 321 Ill. App. 3d at 24, 25. The *Childress* court further deemed *Hawkins* "instructive" on the issue of whether the defendant had taken a substantial step toward the commission of a criminal sexual assault. *Childress*, 321 Ill. App. 3d at 25.

We believe that *Montefolka* has been rightly rejected since its inception, and we decline the defendant's invitation to follow it. We further conclude that the evidence adduced at the defendant's trial was sufficient to support the trial court's finding that, with the intent to commit criminal sexual assault, the defendant took a substantial step toward the commission of that offense.

The defendant's conduct in the present case was strongly corroborative of his criminal purpose and exemplified two of the factors set forth in section 5.01(2) of the Model Penal Code–factors (d) and (f). As previously noted, the defendant broke into C.F.'s basement in

13

the middle of the night, when C.F. would likely be asleep and vulnerable. The defendant therefore satisfied factor (d) by gaining unlawful entry into the structure where the crime would be committed. Once inside, the defendant rummaged through C.F.'s basement in search of items that he could use as bindings, and when he appeared upstairs, he was holding a rope tied "like a slipknot" and a long leather strap that was cut from a purse; both the rope and the strap could have been used to bind C.F.'s hands or otherwise physically restrain her. Thus, once inside the place contemplated for the crime's commission, the defendant collected, fabricated, or possessed materials to be employed in the crime's commission, and the possession, collection, or fabrication of the materials served no lawful purpose under the circumstances; the defendant's conduct therefore satisfied factor (f). In light of the evidence supporting the inference that the defendant entered C.F.'s home with the intent to commit an act of sexual penetration, the defendant's struggling with C.F. also constituted a substantial step toward the commission of a criminal sexual assault. See *People v. Cosby*, 305 Ill. App. 3d 211, 224 (1999). Where, as here, "a substantial step has already been taken and the perpetrator's intent is clear, abandonment of the criminal purpose upon the resistance of the potential victim does not render those steps already taken insubstantial." *Hawkins*, 311 Ill. App. 3d at 431. Under the circumstances, it would be inappropriate to reverse the defendant's conviction for attempted aggravated criminal sexual assault.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment finding the defendant guilty of residential burglary and attempted aggravated criminal sexual assault.


Affirmed.


SPOMER, P.J., and GOLDENHERSH, J., concur.

14

NO. 5-05-0063

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the |
| ) | Circuit Court of |
| Plaintiff-Appellee, ) | Saline County. |
| ) | |
| v. ) | No. 04-CF-275 |
| ) | |
| JERRY GRATHLER, ) | Honorable |
| ) | Brocton Lockwood, |
| Defendant-Appellant. ) | Judge, presiding. |

_____

**Opinion Filed**:        October 10, 2006

_____

**Justices**:        Honorable Terrence J. Hopkins, J.

               Honorable Stephen L. Spomer, P.J., and
               Honorable Richard P. Goldenhersh, J.,
               Concur

_____

**Attorneys**    Daniel M. Kirwan, Deputy Defender, Rita K. Peterson, Assistant Defender, Office
**for**          of the State Appellate Defender, Fifth Judicial District, 730 E. Illinois Highway 15,
**Appellant**    Suite #1, Mt. Vernon, IL 62864

_____

**Attorneys**    Hon. David Nelson, Saline County State's Attorney, Saline County Courthouse,
**for**          Harrisburg, IL 62946; Norbert J. Goetten, Director, Stephen E. Norris, Deputy
**Appellee**     Director, Patrick D. Daly, Staff Attorney, Office of the State's Attorneys Appellate
               Prosecutor, 730 E. Illinois Highway 15, Suite #2, Mt. Vernon, IL 62864

_____