SECOND DIVISION
OCTOBER 19, 2010

1-08-1126

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 29867 |
| | ) | |
| JAMES DECALUWE, | ) | Honorable |
| | ) | Timothy Chambers, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the opinion of the court:

The defendant, James Decaluwe, was indicted for the offenses of armed violence, attempted aggravated criminal sexual assault and aggravated kidnapping. At his jury trial in the circuit court of Cook County, the defendant raised an insanity defense. The jury was provided with the following verdict forms as to each of the offenses: not guilty, not guilty by reason of insanity, guilty, and guilty but mentally ill. On December 14, 2007, the jury found the defendant guilty of armed violence, attempted aggravated criminal sexual assault and aggravated kidnapping. The defendant's motion for a new trial was denied. The defendant was sentenced to consecutive terms of imprisonment of 15 years for armed violence, 6 years for attempted aggravated criminal sexual assault and 6 years for aggravated kidnapping. The trial court denied the defendant's motion to reconsider the sentences. A notice of appeal pursuant to Supreme Court Rule 606(b) was timely filed by the defendant. 210 Ill. 2d R. 606(b).

On appeal, the defendant raises the following issues: (1) whether his conviction for attempted aggravated criminal sexual assault must be reversed because the "substantial step" element of aggravated criminal sexual assault was not satisfied, and (2) whether the trial court erred in allowing the State to introduce into evidence marginally relevant and highly prejudicial photographs. For the reasons stated below, we reverse the defendant's conviction and sentence for attempted aggravated criminal sexual assault; further, we reverse and remand for a new trial the defendant's convictions and sentences for armed violence and aggravated kidnapping.

## BACKGROUND

The record reveals that on November 17, 2004, at approximately 6 p.m., the defendant James Decaluwe drove his Cadillac automobile to a basketball court at a school in Lincolnwood, Illinois, where several male youths were playing basketball. The defendant asked if any of the youths wanted to help him move boxes for $100, and they all responded affirmatively. The defendant chose the 14-year-old victim (U.A.) from the group of boys.

At trial, U.A. gave the following testimony. He entered the backseat of the defendant's car but moved to the front seat when the defendant ask him to do so. The defendant introduced himself as "Jack," and during the ride, the defendant touched U.A. on his shoulder and near his thighs and said that they were "going to have a fun time." The defendant parked one block from his house, and he and U.A. walked through an alley to the defendant's backyard. U.A. unlocked the gate at the defendant's request and they walked through the backyard and entered the basement of the house through the back door. U.A. testified that the defendant said no one else was at home. The defendant asked U.A. to sit on the sofa. The defendant handed U.A. a camera, telling U.A. that U.A.

2

was going to take a picture of the defendant. The defendant then told U.A. that he was going upstairs to change and warned U.A. that if the defendant's wife came down to the basement, U.A. should hide behind the sofa. The defendant then left for about 30 seconds and returned wearing the same clothing. His jacket was open and a gun was tucked in his waistband.

U.A. further testified that when the defendant allowed him to leave the basement to get water, he opened the door and ran outside. The defendant ran after him. The defendant caught U.A. and held his sweater, brandishing a gun. The defendant pointed the gun at U.A.'s head and said, "You better come back in before I kill you." U.A. persuaded the defendant to release his grip momentarily. However, when the defendant released his hold on U.A.'s sweater, U.A. ran away from the defendant and escaped. U.A.'s family contacted the police. In the two days that followed, U.A. led police officers to the defendant's home, described the contents of the defendant's backyard and gave a description of the camera and gun that he saw in the defendant's home. He also identified the defendant in a photo lineup and in an in-person lineup.

A day after the event, the Lincolnwood police obtained a warrant to arrest the defendant and a search warrant allowing a search of the defendant's home and car. The physical search started shortly before midnight on November 18, 2004, and uncovered a green Polaroid camera that U.A. identified in court as the one which the defendant handed him in the basement. The search also turned up shredded photographs in a wastebasket in the defendant's home. In addition, three photographs along with a Polaroid camera were discovered among the belongings of the defendant's girlfriend, who also lived in the house. One photograph depicted a dog, one was of the defendant wearing only shorts, and a third photograph was the torso of a nude adult male.

The defendant's girlfriend, Margaret Cronin, whom he later married, was present at the home at the time of the police search. When asked about the whereabouts of a gun, Cronin at first said that during the prior week the defendant had asked her to take the gun out of the house and she gave it to her boss, William Meskin. Cronin later changed her story and said the defendant and she had driven to Meskin's house just that day, November 18, at approximately 9:30 p.m. and gave Meskin the gun. A police officer drove Cronin to Meskin's house and they retrieved the gun.

Cronin gave the following testimony during the trial. Starting on approximately November 15, 2004, the defendant had been acting "very psychotic, being very threatening; [j]ust acting very abnormal." She did not feel safe, so she moved out of the bedroom they shared. Cronin testified that the defendant became very paranoid, that he stated that he heard voices and thought someone was watching him. The defendant spoke of delusional stories about being contacted by a congressman regarding Russian helicopters. Cronin identified the subjects in the photographs that had been retrieved from the home during the police search. They were photographs of the dog that she and the defendant jointly owned, the defendant in his shorts and the defendant's naked torso. Cronin stated that she had taken the photographs in 1999 "for fun."

Cronin also stated that neither she nor the defendant had been sleeping for several days leading up to November 18, 2004. When Cronin arrived home from work on November 18, the defendant told her that he had hired a young boy the day before to help pack stereo equipment in the basement because Cronin had told the defendant that he had to move out of the house. The defendant told Cronin that when he left the basement, the boy ran out of the door. The defendant, fearing that the boy had stolen something, yelled at the boy, threatening to kill him. The defendant told Cronin

4

that he feared the police might come and take his gun away since he had threatened to kill the boy.

Cronin agreed that the gun that the prosecutor showed her during trial might have been the gun that belonged to the defendant. She also stated, "a gun is a gun to me. They all look the same, menacing." Cronin testified that on Monday night, November 15, 2004, the defendant threatened her with a gun because she refused to have sex. She was able to get the defendant to calm down. She also believed that defendant owned a rifle that he kept in the basement. However, she never thought about it when they were delivering the handgun to her boss. The rifle was discovered during the police search.

Cronin testified regarding the defendant's use of the diet pill Bontril. She said that when the defendant took the pill, he acted very restless and aggressive, had mood swings, did not eat, had a distended abdomen, was thirsty, drank a lot of water, would stare blankly into space and did not sleep. Cronin believed that the defendant started taking Bontril in early October 2004. During the week of November 15, according to Cronin, the defendant was acting very paranoid and heard voices and music, and told her delusional stories. On Tuesday, November 16, Cronin had threatened the defendant that if he did not seek help from a psychiatrist, he would have to leave the house. The defendant had an appointment with his psychiatrist on Tuesday, November 16, but did not keep it. Cronin testified that after that, they "kind of stopping communicating."

Cronin said that when she had first arrived home from work on the evening of November 18, the house was dark and the defendant was slumped over in a chair, drooling. After Cronin revived him, he could not talk for several minutes. The defendant told her that he had taken a lot of medication to counteract the effects of the Bontril. That same evening, on the way back from taking

the gun to her employer's house, Cronin attempted to drive the defendant to Lutheran General Hospital, but when he realized what she was doing, he tried to get out of the car.

There was testimony at trial by Sergeant John Walsh of the Lincolnwood police department that the defendant had received his Miranda rights at the police station and that he admitted picking up U.A., whom the defendant described as 16 years old. He also admitted that he took U.A. through the alley to the basement of the house he shared with Cronin. The defendant claimed he offered U.A. $20 to move boxes. According to the defendant's confession, the defendant went to the garage to get some tape and saw the boy running out the back door. The defendant thought the youth had stolen something from him, so the defendant shouted, "You either get back here right now or I will blow your fucking head off." He looked unsuccessfully for the boy after he ran away.

According to police testimony, the defendant's version of the events changed during his interrogation at the police station. The defendant's demeanor was very cooperative and articulate, and the defendant remembered details. The defendant never mentioned hallucinations. There was also testimony from the police officer that when confronted with the information that the police knew about him using a gun to force Cronin to have sex, the defendant related a sexual fantasy he had that Cronin would have sex with a boy. Sergeant Walsh testified that the defendant stated that prior to finding U.A. at the basketball court, he had driven around the Lincolnwood Town Center Mall looking for a boy.

According to testimony from Sergeant Walsh, the defendant told Walsh that he wanted the boy to take nude photographs of him and he wanted to have sex with the boy. Walsh testified that the defendant said he "was able to stop himself." According to Walsh's testimony, the defendant

6

stated that he knew the police would be coming, that he got rid of the gun, and that he shredded some nude photographs of himself and Cronin. Walsh further testified that the defendant said he believed that his actions regarding U.A. resulted from a homosexual encounter that he had in high school. Assistant State's Attorney Richard Albanese testified that he had a conversation with the defendant prior to taking the defendant's statement, and the defendant did not mention wanting to have sex with the boy. According to Detective Walsh's testimony, when later questioned about that omission, the defendant stated he did not want to talk about it. The defendant's signed statement which was introduced into evidence, included a portion that stated he was giving the statement free from the effects of drugs and alcohol "except for the diet pills he took at about 3:00 p.m. on Thursday, November 18th."

A psychiatrist retained as an expert witness by defense counsel testified that the defendant suffered from bipolar disorder, amphetamine psychosis and borderline personality disorder. The psychiatrist's opinion was based on interviews with the defendant and his wife, police reports, a discussion with the defendant's treating psychiatrist, and the defendant's medical and prescription history. The treating psychiatrist related to the expert that the defendant had struggled with a series of addictions, including compulsive gambling, cocaine, amphetamines and alcoholism. According to the treating psychiatrist, the defendant had been on various mood stabilizers and antidepressants and starting in mid-October 2004, was prescribed a high dose of a diet pill named Bontril that was similar to an amphetamine. After taking these pills, the defendant had two car accidents, had become agitated and told Cronin about his auditory hallucinations.

Immediately after his arrest, the defendant spent two weeks in the psychiatric wing of Cook

County jail and was diagnosed with a mild bipolar disorder and placed on suicide watch. The psychiatrist for the defense also testified that the defendant's self-image and his sexual functioning had been compromised by testicular cancer at age 20 and prostate cancer in 2000, and from the treatment for those cancers.

The State called Dr. Susan Messina, a psychologist, as an expert witness. She testified that she had interviewed the defendant on several occasions, had spoken with the defendant's treating psychiatrist and had reviewed police and medical reports. Dr. Messina's conclusion was that although the defendant had addictive polysubstance dependence and bipolar disorder in partial remission, he was legally sane at the time of the offenses and did not lack substantial capacity to appreciate the criminality of his actions.

During jury deliberations, the jury questioned the court regarding the meaning of the verdict of "guilty with a mental illness." The court referred the jury to the instruction defining mental illness as a substantial disorder of thought, mood, or behavior "which impaired [the defendant's] judgment, but not to the extent that he was unable to appreciate the wrongfulness of his behavior." The jury returned a verdict of guilty of armed violence, attempted aggravated criminal sexual assault and aggravated kidnapping. The defendant received consecutive sentences of 15 years for armed violence, 6 years for attempted aggravated criminal sexual assault and 6 years for aggravated kidnapping, for a total of 27 years' imprisonment. The defendant's motion for a new trial was denied by the trial court. The defendant's motion to reconsider his sentence as being excessive was also denied by the trial court. The defendant filed a timely appeal.

On appeal, the defendant claims that (1) his conviction for attempted aggravated criminal

sexual assault must be reversed because his actions did not satisfy the "substantial step" element of attempted aggravated criminal sexual assault, and (2) the trial court erred in allowing the State to introduce marginally relevant and highly prejudicial photographs into evidence during the trial.

## ANALYSIS

Our supreme court has made it clear that the issue of jurisdiction is a threshold issue, whether or not the parties have raised it. Secura Insurance Co. v. Illinois Farmers Insurance Co., 232 Ill. 2d 209, 213, 902 N.E.2d 662, 664 (2009). In this case, although the State has not raised the question of jurisdiction, we examine that question *sua sponte*. The defendant's notice of appeal stated that he was appealing from "2 counts of Armed violence and kidnapping." However, on appeal the first issue raised by the defendant is whether his conviction for attempted aggravated criminal sexual assault should be reversed.

We are mindful that a strict construction of the requirements of Supreme Court Rule 606(d) would mean that this court does not have jurisdiction to consider the issues raised by the defendant on appeal regarding his conviction for the offense of attempted aggravated criminal sexual assault because he has not specifically listed that offense in his notice of appeal. 210 Ill. 2d R. 606(d); People v. Lowe, 30 Ill. App. 3d 49, 51, 331 N.E.2d 639, 640-41 (1975). However, if we examine the case law regarding this jurisdictional question, it is evident that a notice of appeal should be liberally construed and considered as a whole. The notice will be "deemed sufficient to confer jurisdiction on an appellate court when it fairly and adequately sets out the judgment complained of and the relief sought, thus advising the successful litigant of the nature of the appeal." Lang v. Consumers Insurance Service, Inc., 222 Ill. App. 3d 226, 229, 583 N.E.2d 1147, 1150 (1991).

In the case of People v. Lewis, 234 Ill. 2d 32, 912 N.E.2d 1220 (2009), the supreme court held that although the defendant only listed the order denying his motion to suppress evidence in his notice of appeal and he was also challenging a street-value fine that was imposed without an evidentiary hearing and the appellate court did have jurisdiction over the appeal. In that case, the court noted that the defendant's notice of appeal accurately identified his conviction, and the section of the notice form headed "Nature of order appealed from, other than conviction" was left blank. Similarly, in the instant case, the defendant left the section labeled "Nature of order appealed from, other than conviction" blank, indicating that he was appealing from his entire conviction. The court in Lewis determined that the defendant's notice of appeal was sufficient to confer jurisdiction on the appellate court when the notice was considered as a whole and liberally construed. Lewis, 234 Ill. 2d at 39, 912 N.E.2d at 1225. See also People v. Frey, 50 Ill. App. 3d 437, 444-45, 365 N.E.2d 283, 289 (1977) (where the court stated that, although the defendant's notice of appeal did not mention the specific theft conviction he was attacking on appeal, "[a]ll but the most narrow and technical reading of the instant notice of appeal would indicate that defendant was appealing from all the judgments entered below, including the conviction of theft").

In this case, the defendant did not specifically list his conviction for attempted aggravated criminal sexual assault on the notice of appeal form; however, the issue was fully briefed and argued by him and by the State. At no point in the appellate process did the State raise the issue of forfeiture of this issue by the defendant because he failed to list that specific conviction in his notice of appeal. The State was clearly informed of the nature and basis of the defendant's appeal. Both sides made arguments directed to the issue of the conviction for attempted aggravated criminal sexual assault so

it cannot be said that the State did not have sufficient notice of the issue, nor was the State prejudiced in any way. Accordingly, this court has jurisdiction to hear the defendant's appeal from his conviction for attempted aggravated criminal sexual assault.

A person commits the offense of aggravated criminal sexual assault when he commits an act of sexual penetration upon the victim by use of force or threat of force during the commission of any other felony. 720 ILCS 5/12-13(a)(1), 12-14(a)(4) (West 2004). An examination of the specific indictment against the defendant relating to the charge of attempted aggravated criminal sexual assault in this case reveals that the defendant was charged as follows:

> "Attempt aggravated criminal sexual assault - while armed
> with a handgun, demanded verbally and physically that the victim take
> naked pictures of him."

Since the crime of sexual assault requires sexual penetration of the victim, the defendant argues that attempted criminal sexual assault must necessarily include a substantial step toward sexual penetration. The defendant asserts that the conduct alleged in the indictment does not constitute a substantial step towards sexual penetration as would be necessary to complete the crime charged. Further, there was no testimony from U.A. that the defendant specifically demanded that U.A. take *naked* photographs of the defendant.

In determining what constitutes a substantial step towards sexual penetration as contemplated in the offense of attempted criminal sexual assault, courts must examine the facts and the circumstances of each case. People v. Grathler, 368 Ill. App. 3d 802, 809, 858 N.E.2d 937, 943 (2006). As the appellate court stated in People v. Hawkins, 311 Ill. App. 3d 418, 427, 723 N.E.2d

1222, 1229 (2000), "[a]n attempt crime is one 'that falls short of completion through means other than the defendant's voluntary relenting,' " quoting People v. Dogoda, 9 Ill. 2d 198, 203, 137 N.E.2d 386, 389 (1956). "The crime of attempt is complete upon the completion of a substantial step (with the requisite intent), and subsequent abandonment of the criminal purpose is no defense." Hawkins, 311 Ill. App. 3d at 424, 723 N.E.2d at 1226, citing People v. Myers, 85 Ill. 2d 281, 290, 426 N.E.2d 535, 539 (1981). When a reviewing court is asked to set aside a criminal conviction for insufficiency of evidence, the relevant standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Jackson, 232 Ill. 2d 246, 280, 903 N.E.2d 388, 406 (2009).

On appeal, the defendant acknowledges that the State proved his *intent* to have sex with the victim via Sergeant Walsh's testimony at trial wherein the defendant admitted to Walsh that he wanted to have sex with the victim. What the State failed to prove, the defendant argues, is that he performed a substantial step toward the sexual penetration of the victim.

During the trial, the State's witnesses related the content of the defendant's conversations after his arrest wherein the defendant stated that he wanted U.A. to take nude photographs of him. There was also testimony that the defendant admitted that he had experienced a sexual fantasy wherein Cronin had sex with a boy and that he had a homosexual experience in high school. Sergeant Walsh testified that the defendant admitted to him that he wanted to have sex with U.A., but was able to "stop himself." The written confession that the defendant signed, however, had no mention of the defendant's desire to have sex with the victim, merely the desire to have the victim take nude photographs of the defendant.

12

The issue is, however, whether the defendant took a *substantial step* toward sexual penetration of the victim, thereby committing the crime of attempted aggravated criminal sexual assault. The defendant had not disrobed, had not asked the victim to disrobe, and had not told the victim that he wanted to commit a sexual act with him, nor had the defendant committed an act which would have indicated that he intended to have sex with the victim. The only acts which the State alleged in the indictment were "while armed with a handgun, [the defendant] demanded verbally and physically that the victim take naked pictures of him." However, the record reveals that there was no testimony presented at trial in which U.A. testified that the defendant demanded that he take nude photographs of the defendant.

U.A.'s testimony stated that the defendant handed him a camera and told him that he was going to have U.A. take photographs of the defendant. Although a police officer testified that the defendant admitted during interrogation following his arrest that he wanted U.A. to take nude photographs of him, the record shows that the defendant never communicated that request to U.A. There was no mention of nudity according to U.A.'s testimony. Although the State introduced into evidence the photograph of the nude male torso that was found among Cronin's things, the record reveals no nexus between that photograph and the events of November 17, 2004, which culminated in the defendant being charged with attempted aggravated criminal sexual assault. The State advances no sufficient or relevant evidence in furtherance of its argument that the defendant had committed a substantial step toward sexual penetration of the victim as required to prove the essential element of the crime charged. The record makes it clear that no such evidence exists.

Accordingly, we hold that the facts of this case do not prove beyond a reasonable doubt the

13

charge of attempted aggravated criminal sexual assault. As discussed, the facts alleged in the indictment and those revealed at trial were not sufficient to make a finding beyond a reasonable doubt of attempted aggravated criminal sexual assault. We therefore reverse the defendant's conviction and sentence on this count.

The defendant's second contention on appeal is that the trial court erred in allowing the State to introduce into evidence two irrelevant and highly prejudicial photographs, one that depicted the defendant nude and the other in which he is shown wearing only shorts. We review a trial court's decision to admit evidence under the standard of abuse of discretion. People v. Kliner, 185 Ill. 2d 81, 146, 705 N.E.2d 850, 883 (1998). The trial court's exercise of its discretion will not be disturbed unless there has been an abuse that has prejudiced the defendant. People v. Williams, 181 Ill. 2d 297, 314, 692 N.E.2d 1109, 1119 (1998). Evidence is relevant, and thus admissible, where it tends to prove a material fact at issue *and* where the probative value of the evidence outweighs the prejudicial effect. People v. Bobo, 375 Ill. App. 3d 966, 972, 874 N.E.2d 297, 305 (2007). Evidence of a defendant's prior acts may be admitted in order to prove a defendant's motive, intent, identity or the absence of mistake. People v. Foster, 76 Ill. 2d 365, 374, 392 N.E.2d 6, 10 (1979).

The defendant in this case argued unsuccessfully during a hearing *in limine* before the trial that the photographs were not relevant and were too far removed in time from the alleged crimes to be allowed into evidence. The defendant also objected at trial when the photographs were admitted. The defendant argues on appeal that the photographs had minimal relevance to his sanity at the time of the incident and admission of the photographs "had the likely effect of making [him] look deviant or ridiculous in the eyes of the jury." The defendant further claims that this error in admitting the

14

photographs was not harmless because he had made a strong case that he was legally insane at the time of the offenses or that he was guilty but mentally ill. The effect of the photographs, the defendant urges, was to strongly persuade the jury that he was the type of person who would, in the absence of mental disease or defect, attempt to force a young boy to participate in his "fetish."

The defendant relies upon the case of People v. Hendricks, 137 Ill. 2d 31, 560 N.E.2d 611 (1990) in support of his argument. In Hendricks, the supreme court ruled that evidence of the defendant's prior acts, which was intended to prove an intent to commit murder, was not sufficiently linked to the offense and was not used for the purpose the prosecution stated. The prior acts did not, in fact, show a progression of sexual aggression that the State relied upon to establish a motive for the crime, but instead painted the defendant as evil and perverted and confused the issue as to why that evidence was offered. Hendricks, 137 Ill. 2d at 54-55, 560 N.E.2d at 621-22.

The defendant also argues that the case of People v. Kannapes, 208 Ill. App. 3d 400, 567 N.E.2d 377 (1990), supports his contention that it was error to allow the photographs into evidence and that they were highly prejudicial to him. In the Kannapes case, the defendant was charged with and convicted of the crime of delivery of cocaine. The State offered into evidence a photograph of the defendant wearing a shirt that had the words "Enjoy Cocaine." The reviewing court reversed the conviction and remanded the case because it concluded that the State had invited the jury to draw the conclusion that defendant was guilty of the crime because he had been photographed in a T-shirt bearing the words "Enjoy Cocaine." Kannapes, 208 Ill. App. 3d at 407, 567 N.E.2d at 381.

In this case, on appeal and during the trial, the State argued that it used the photographs to corroborate testimony that defendant had admitted that he wanted the victim to take nude

photographs of him. There was testimony offered at trial that defendant stated in his conversations with police after he was arrested that he had destroyed nude photographs of himself and his girlfriend before the police search. The State contends that the admission of the photographs and the testimony at trial that the police found shredded photographs in defendant's home combine to corroborate the defendant's statement that he wanted to have the victim take nude photographs of him. Cronin testified that she had taken the nude photograph of the defendant five years earlier and it was found among her belongings. There was no evidence that the defendant owned the photograph or had any knowledge that Cronin had kept it during the five years since it was taken.

Evidence is relevant at trial if it has the tendency to make the existence of a fact that is important to the determination of an action either more or less probable then it would be without the evidence. People v. Morgan, 197 Ill. 2d 404, 455-56, 758 N.E.2d 813, 843 (2001). Evidence may be rejected by a trial court on the grounds of relevancy if the evidence is remote, uncertain or speculative. People v. Cloutier, 156 Ill. 2d 483, 501, 622 N.E.2d 774, 784 (1993). Additionally, admissibility may also depend upon whether the probative value of the evidence outweighs its prejudicial effect on the defendant. People v. Monroe, 66 Ill. 2d 317, 323, 362 N.E.2d 295, 297 (1977).

We believe that allowing the photographs into evidence in this case invited speculation by the jury regarding the defendant's character. Given the nature of the charges, it can reasonably be inferred that the photographs affected the jury's judgment about the defendant. Any probative value that the photographs may have had was greatly outweighed by their prejudicial effect on the jury. In this context, it has been recognized that the term "prejudice" means " 'an undue tendency to

16

suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror.' " People v. Eyler, 133 Ill. 2d 173, 218, 549 N.E.2d 268, 288 (1989), quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1 (4th ed. 1984).

In this case the State has not advanced a reasonable explanation regarding how the two photographs were relevant to the crime charged. Given the highly prejudicial impact of such evidence, the probative value must clearly be established. We find no such probative value. What we do find is a highly prejudicial impact by the introduction into evidence of five-year-old photographs of questionable relevance. We hold that it was error for the trial court to have allowed the photographs into evidence.

Accordingly, for the reasons stated, we reverse the defendant's conviction and sentence for attempted aggravated criminal sexual assault.

We reverse and remand for a new trial the defendant's convictions and sentences for armed violence and aggravated kidnapping. We note that, if the evidence had been presented at trial in a manner free from error, there was sufficient evidence to convict the defendant of these two offenses. Thus, there is no issue of double jeopardy as to these two counts. People v. Baines, 399 Ill. App. 3d 881, 900, 927 N.E.2d 158, 173 (2010).

Reversed in part and reversed and remanded in part.

THEIS, P.J., and KARNEZIS, J., concur.