2020 IL App (1st) 170130-U

No. 1-17-0130

Third Division
June 24, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 15 CR 12847 |
| v. | ) | |
| | ) | |
| JACQUES LEWIS, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | James B. Linn, |
| | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Ellis and Justice Howse concurred in the judgment.

**O R D E R**

¶ 1     *Held*:   The trial court did not commit plain error in admitting Facebook messages or defendant's prior acts into evidence. Defense counsel was not ineffective in failing to object to the introduction of prior acts evidence.

¶ 2     Following a bench trial, defendant Jacques Lewis was convicted of aggravated domestic battery and sentenced to three years' imprisonment. On direct appeal, defendant argues that: (1) the trial court erred in admitting Facebook messages into evidence, (2) the trial court erred

in admitting prior acts evidence involving domestic battery, and (3) defense counsel was ineffective for allowing the prior acts evidence to be admitted. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged with aggravated kidnaping (720 ILCS 5/10-2(A)(3) (West 2014)), aggravated domestic battery (720 ILCS 5/12-3.3(A-5) (West 2014)), and unlawful restraint (720 ILCS 5/10-3 (West 2014)), relating to an incident between he and then-wife, Angel Powell, that occurred on July 16, 2015. A co-defendant, Dantrell Blind,[1] was also charged with aggravated kidnaping and other offenses relating to the same event.

¶ 5        Prior to trial, the State filed a motion *in limine* requesting that the court permit testimony concerning prior alleged incidents in which defendant committed domestic violence against Powell. As alleged in the motion, the first incident occurred on May 20, 2015, when Powell brought her and defendant's then-7-week-old child to Lurie Hospital in Chicago. Defendant arrived at the hospital, threatened Powell, and pushed her against a wall. He then bit her on the face and attempted to take the child from the hospital before fleeing. Powell's injuries were photographed. The second incident occurred in Kansas on June 3, 2014. According to the motion, defendant and Powell began arguing at a motel, during which defendant head-butted Powell and dragged her to his car. Powell attempted to call for help, but defendant covered her mouth and continued to attack her in his car until he was stopped by a friend. Her injuries were photographed from this incident also.

¶ 6        The motion was addressed in court on June 21, 2016, at which time the State made the following proffer:

_____
[1] Blind is not a party to this appeal.

"Judge, going off my memory, there was a prior incident, I believe it was from a year, possibly two years before this incident, involving the same defendant and the same victim. It took place in Kansas. *** There was an argument that turned into a physical altercation between this defendant and the same girlfriend at the time. It was while he was – they were both in Kansas. Police were called. There were photographs taken of her injuries. Similar aspects of it, again just by memory, it involved him getting her into a car and then attacking her in the car as he drove and he also was removed from the scene by a different friend of his."

Defense counsel argued that the incident did not show a pattern of behavior, but only propensity. The court concluded, "I'm going to say that the Government may introduce this in their case in chief because it shows context and it would be relevant and probative – more probative than prejudicial for those reasons."

¶ 7      At the bench trial, Powell testified that she is married to defendant and that they have one child together. On July 16, 2015, Powell drove from her work to school at Chicago State University, where she arrived around 6:45 p.m. She exited her car and went to the trunk to retrieve her bookbag. As she was doing so, defendant came up behind her, took her phone from her back pocket, and said, "You thought I wasn't going to catch you." They started "fighting and wrestling" over her phone, during which time defendant punched Powell in the face and body. She was able to get her phone back and then ran to the driver's side of the car with the intention of driving away. Defendant opened the driver's door, and they began fighting again, during which defendant bit her face. Powell climbed out of the passenger door and ran away, but defendant caught her and took her phone again. She ran after defendant, who broke her phone by throwing it on the ground after accusing her of cheating on him with a man named

Tony. Defendant then walked to the car in which he arrived, which was a blue Jaguar. Powell observed Blind standing outside of the car holding a blue baseball bat. As defendant and Blind drove away, defendant said to Powell, "That's why I broke your phone." After they left, Chicago State University police officer Timothy Williams arrived and spoke with Powell.

¶ 8    Powell testified that she did not remember defendant wrapping his hand around her throat at any point during this incident and that she did not remember losing consciousness. She stated that he did pull her hair during the fighting. She stated that she also had a bite mark on her hand in addition to on her face.

¶ 9    At the police department, Powell gave a written statement in which she wrote that defendant choked her and forced her into her car. It also stated that he bit her on the face and hand and she tried to escape through the passenger door of the car.

¶ 10    There was also a videotaped statement Powell gave to an assistant state's attorney on July 17, 2016. The video would not play in court, and the parties stipulated to what was said in the statement. In the statement, Powell stated that defendant choked her until she lost consciousness. Defendant then dragged her to her car and threw her inside. Finally, she stated that she saw Blind walking towards her with the bat.

¶ 11    The State introduced photographs taken on the day of the incident that show Powell's injuries. The photographs show what Powell testified were a bite mark on the left side of her face, red markings on her neck, and a bite mark on her left hand.

¶ 12    The State then showed a surveillance video, albeit an extremely blurry one, from Chicago State University that portrayed the events of the day at issue. Powell narrated as the video played in court. The video shows Powell arriving in her car and walking to her trunk. The video shows another car pulling up behind her and two individuals exit the car. One individual begins

walking toward Powell. At this point, it is impossible to tell what is going on. It then shows Powell and defendant outside of the driver's side and then entering the vehicle from the driver's side. Powell exits the passenger side of the car, and defendant follows her around the car. A few moments later, Powell runs after defendant to another area of the parking lot. He then gets into a blue Jaguar with Blind and drives away.

¶ 13    Powell further testified that she has a Facebook account but she is not "friends" with defendant on Facebook. She stated that defendant did have a Facebook account but the name on it was "Doty Lewis."[2] In July of 2016, defendant contacted her through that account via private messages over several days. Defense counsel objected to the introduction of the Facebook messages due to insufficient evidence that defendant was the person who sent them. The court overruled the objection, stating:

"She said she knows his name on Facebook. She's married to him. That they had communicated on Facebook. I think she is in a position to identify whether those were messages from him, her husband or not. She may do that."

¶ 14    The State introduced a five-page printout of messages Powell received from the "DoDe Lewis" account between July 7, 2016, and July 15, 2016. In the messages, the sender threatens to injure and kill Powell using very obscene language. The sender also reveals some personal information, such as the fact that they have a son, are paying child support, and that their mother is moving in two weeks. The following are a selection of those messages.

¶ 15    On July 7, 2016, DoDe Lewis sent the following message to Powell:

---

[2] This was the spelling used throughout the transcript, though the printout of the Facebook messages shows the Facebook account name as "DoDe Lewis."

"U really making s*** worse on yourself putting s*** on fb n ig then u steady putting clown s*** up but gone b crying when getting f*** up RIP ANGEL COMING SOON ON MY SON ON MY GRANDMA

Then u telling all my business like it's cool lord I highly advice u delete yo fb ig and snapchat today bc that's what's getting u caught up and f*** up frfr and u think s*** so sweet

U thought last time was the worst wait til u c what's fina happen to u this time lil h*** nobody gone save u period[.]"

¶ 16     On July 10, 2016, DoDe Lewis sent this message to Powell:

"On my grandma b*** since u think s*** sweet I'm fina kill yo a*** today and that's on  my son head come outside or b any whr tonight I'm killing u and whoever u with b*** on my grandma[.]"

¶ 17     On July 11, 2016, DoDe Lewis sent this message to Powell:

"B*** u keep going to fb worse u making me want to get on yo a*** today but I'm sticking my normal schedule I'm gone kill u during the week see u soon[.]"

¶ 18     On July 15, 2016, at 1:47 p.m., DoDe Lewis sent this message to Powell:

"U claiming u got all this money and want me to buy all this s*** when I got to save up for my own crib bc my mama moving by herself n 2 weeks I can't lord u stunting like u got it[.]"

¶ 19     On that same day, at 1:49 p.m., DoDe Lewis sent this message to Powell:

"B*** this y a mf want to kill u anyways lord I'm not fina b homeless playing with u b*** I was giving money daily and u wasn't giving me s*** f*** u talking about I have to get a crib n two weeks

U got me f*** up I swear lord mf gone get on yo a*** today watch I highly advice u change yo schedule for the rest of the day bc it's not gone go as planned for u[.]"

¶ 20      Powell was then asked about the incident that occurred at Lurie Children's Hospital on May 20, 2015. She stated that she took her son to the hospital and defendant showed up. They began arguing, and she told him to leave. She recalls defendant biting her lip and then she began screaming at him and he left. Chicago police officer Robert Torres arrived at the hospital, and she told him that defendant pushed her and bit her lip. She does not remember telling Torres that defendant said "I'll kill you." She testified that photographs were taken of her at the time, which show a bite mark on the right side of her mouth.

¶ 21      Powell was asked about the incident that occurred in Kansas on June 3, 2014. She testified that she and defendant had been arguing often during that week. She and defendant began fighting one day, involving punching each other, and defendant broke her phone as she was calling 911. She gave police a handwritten statement regarding this incident in which she stated that defendant head-butted her and held her down. She ran outside, but defendant caught her and covered her mouth and nose so that she could not breathe. From photographs taken on that day, she identified injuries of swelling on her right cheek and redness on her nose. She also identified a photograph of the phone defendant broke that day.

¶ 22      On cross-examination, Powell admitted that she initially told the police that she did not want to prosecute defendant for this incident. She stated that she included in her written statement, which she made at about 4 a.m., that defendant had choked her because she was mad, frustrated, and ready to go. She stated that she did not remember every detail that happened and did not recall defendant forcing her into the car or choking her. She was still married to defendant, and she sees him about once a month to take her son to visit him.

¶ 23    On redirect examination, she testified that she told the paramedics that defendant choked and bit her, and the paramedics arrived immediately after the incident. She also confirmed that defendant followed her to Chicago State University after sending her a Facebook message earlier that day threatening her.

¶ 24    The court inquired as to Powell's current relationship with defendant. She stated that she was dating someone else and only visits defendant so he can have a relationship with their son. She also stated that she had started divorce proceedings and that she would like an order of protection.

¶ 25    Officer Weisinger[3] testified that he responded to a call regarding a vehicle involved in a domestic violence incident on July 16, 2015, at which time he worked for the Chicago University Police Department. The vehicle was described as a blue Jaguar and he also had a partial plate number. He located the Jaguar and conducted a traffic stop near the university. He identified defendant and Blind as the passengers in the vehicle that day. Both were placed in custody, and a baseball bat was recovered from the backseat of the vehicle.

¶ 26    Officer Eugene Heffner testified that he worked for the Chicago University Police Department on July 16, 2015. He was assigned to investigate a case of domestic battery involving Powell and defendants. He interviewed both defendants.

¶ 27    Blind told him that defendant offered him $50 to drive him to see Powell so he could get his money. They first drove to her house and then to Chicago State University. Blind told Heffner that defendant exited the car and said, "Where's my money?" to Powell before they started fighting. He stated that he observed defendant choking Powell. Blind then took a bat out of the car. Defendant walked back to the car and Powell followed him. Defendant grabbed

---

[3] Officer Weisinger's first name does not appear in the record.

Powell and pulled her to the ground. Blind and defendant left after Blind overheard someone say that they were calling the police.

¶ 28     During Heffner's interview with defendant, defendant had a seizure and was transported to a hospital. Heffner spoke with defendant again later, and defendant told him that he went to Chicago State University to get his money from Powell. Powell did not know he was going to be there. He approached her, grabbed her arm, and pulled her to the driver's side of her car. Powell entered the car, kicked him, and tried to climb out the other side. Defendant admitted to Heffner that he bit her hand and tried to pull her back into the car. After they exited the car, he took Powell's phone and walked towards Blind's Jaguar. He looked through Powell's phone because he suspected that she was cheating on him and he then broke her phone.

¶ 29     On cross-examination, Heffner stated that defendant told him at the beginning of the interview that he had a seizure disorder and he needed his medication. Defendant was advised to answer the questions and then he could get his medication, but he had a seizure before the interview concluded.

¶ 30     Defendant moved for a judgment of acquittal on all counts, which the court denied. The defense then rested without presenting evidence. After closing arguments, the court found defendant guilty of aggravated domestic battery and unlawful restraint, but not guilty of aggravated kidnaping. In so ruling, the court found that defendant threatened her on Facebook, followed her to school, attacked her, and choked her. The court specifically found Powell's statements at the time of the incident to be more accurate as to what occurred. Defendant's motion for a new trial was denied. On December 6, 2016, the trial court merged the unlawful restraint charge into the aggravated domestic battery charge and sentenced defendant to three

years' imprisonment on the latter. The court denied his motion to reconsider sentence. This appeal followed.

¶ 31                                   II. ANALYSIS

¶ 32                        1. Admissibility of Facebook Messages

¶ 33     Defendant first argues that the trial court erred in admitting the Facebook messages where the State failed to lay a sufficient foundation authenticating that defendant sent them. The State contends that it was enough for Powell to testify that she knew the account to be one of defendant's and that the messages contained personal information regarding their son.

¶ 34     Defendant concedes that he did not properly preserve this issue for review and requests that this court review it under the plain-error doctrine. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion."). Plain error review "allows a reviewing court to consider unpreserved claims of error in specific circumstances." *Id.* at 613. A defendant bears the burden of persuasion that the plain error doctrine is applicable. *Id.*

¶ 35     Plain error doctrine applies where "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* We must first determine whether an error occurred.

¶ 36     A party must lay a proper foundation before a document may be authenticated and entered into evidence. *People v. Kent*, 2017 IL App (2d) 140917, ¶ 86 (citing to *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 348 (2010)). A Facebook message,

like email and text messages, is considered a document for admissibility purposes. *Id.* Illinois Rule of Evidence 901 (eff. Sept. 17, 2019) provides that the authentication of evidence, such as Facebook messages, "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Authentication can be accomplished through either direct or circumstantial evidence. *Id.* (citing to *Piser*, 405 Ill. App. 3d at 349). It is only necessary to prove a rational basis "upon which the fact finder can conclude that the document did in fact belong to or was authored by the party alleged." *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51. Such a finding "does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied." *People v. Downin*, 357 Ill. App. 3d 193, 203 (2005). "The ultimate issue of authorship is for the trier of fact to determine." *Id.*

¶ 37        A trial court's decision to admit evidence is reviewed under an abuse of discretion standard. *People v. Decaluwe*, 405 Ill. App. 3d 256, 266 (2010). An abuse of discretion occurs when no reasonable person would take the view adopted by the court. *In re Dionte J.*, 2013 IL App (1st) 110700, ¶ 64. Reasonable minds can differ as to whether certain evidence is admissible without necessitating a reversal of the trial court's ruling under this standard. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003).

¶ 38        Defendant argues that the authentication was insufficient because Powell did not provide any testimony as to how she knew that the messages were from defendant and the information contained in the messages were not so personal that only she and defendant would know. There was also no information elicited about the Facebook account, "DoDe Lewis," from which the messages were sent.

¶ 39     Though there have been a few cases on the authentication of text messages and e-mails, the only published case in Illinois dealing with the authentication of Facebook communications is *People v. Kent*, 2017 IL App (2d) 140917.

¶ 40     There, the defendant, Lorenzo Kent, was charged with shooting a man and leaving him dead in his driveway. *Id.* ¶¶ 3-4. At trial, the State introduced a Facebook post reading "it's my way or the highway…leave em dead n his driveway" that the defendant purportedly made from his account bearing the name "Lorenzo Luckii Santos" on the day after the shooting. *Id.* ¶¶ 5, 57. By way of authentication, the State established that the defendant's first name was Lorenzo and he sometimes went by the nickname "Lucky." *Id.* ¶ 9. The photograph associated with the account also resembled the defendant. *Id.* ¶ 57. The Second District panel found that the State had failed to sufficiently authenticate that the Facebook post was written by the defendant. *Id.* at ¶ 116. In so ruling, the court recognized that authenticating social media evidence posed "unique issues" due to the ease with which imposters can create fake profiles and access the personal information of others. *Id.* ¶ 105 (quoting *Smith v. State*, 136 So. 3d 424 (2014)). In particular, the court stated that anyone could have created the post "if he or she knew the defendant by his alleged alias, knew about the shooting and the underlying feud [between the defendant and the deceased], and had digitally mined an image of someone who looked like the defendant." *Id.* ¶ 113. Additionally, the court opined that the shooting had gained enough attention that the location of the body in the driveway could have been known to a number of people. *Id.*

¶ 41     In coming to its decision, the *Kent* court also relied on two cases from other jurisdictions: *United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014), a federal circuit court case, and *Smith v. State*, 136 So. 3d 424 (2014), from the Supreme Court of Mississippi.

¶ 42    In *Vayner*, the defendant was convicted of transferring a false identification document based on a forged birth certificate he created for Vladyslav Timku, a Ukrainian citizen living in Brooklyn, New York. The birth certificate entitled Timku to a deferment from compulsory military service in Ukraine. *Id.* at 127. The trial court admitted into evidence a printout of a web page that the government claimed was the defendant's profile on VK.com (VK), a Russian social networking site similar to Facebook. *Id.* The profile included information that corroborated Timku's testimony that the defendant created the birth certificate. *Id.* On appeal, the defendant argued that this web page was not properly authenticated under Rule 901 of the Federal Rules of Evidence, akin to Illinois Rule of Evidence 901. *Id.*

¶ 43    The Second Circuit concluded that the trial court abused its discretion in admitting the web page because "there was no evidence that the defendant himself had created the page or was responsible for its contents." *Id.* at 132. The court found that the fact that the profile page had the defendant's name and photograph was insufficient to reasonably conclude that it was created by the defendant. *Id.* Moreover, the information contained on the profile page was not so obscure or uniquely distinctive such that only the defendant would have knowledge. *Id.*

¶ 44    In *Smith*, the defendant was accused of killing a child. 136 So. 3d at 426. The prosecution introduced into evidence Facebook messages purportedly sent by the defendant to his wife regarding problems he was having with the child. *Id.* The Supreme Court of Mississippi held that the trial court erred in admitting the messages because they had not been properly authenticated. *Id.* at 435. The Facebook profile associated with the messages bore the defendant's name and picture, but there was no other personal information on his profile. *Id.* at 434. The court stated that "something more than simply a name and small, blurry photograph purporting to be Smith is needed to identify the Facebook account as his in the first place." *Id.*

at 433. The court further opined that the State did not elicit any testimony from the defendant's wife as to how she knew that the messages were sent from her husband and the information in the messages was known to individuals other than defendant and his wife. *Id.* at 434-35.

¶ 45    Both of these courts explained the manner in which Facebook documents can be authenticated. The *Vayner* court emphasized the content of the information and whether the information was based solely on personal knowledge or knowledge only known to a small group of people. 769 F.3d at 132; see also *Downin*, 357 Ill. App. 3d at 203 ("*Prima facie* authorship of a document may include a showing that the writing contains knowledge of a matter sufficiently obscure so as to be known to only a small group of individuals."). In a non-exhaustive list, the *Smith* court identified six ways in which a Facebook communication could be authenticated: (1) the purported sender admits authorship, (2) the purported sender is seen composing the communication, (3) business records of an Internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone, (4) the communication contains information that only the purported sender could be expected to know, (5) the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or (6) other circumstances peculiar to the particular case may suffice to establish a *prima facie* showing of authenticity. *Smith*, ¶ 21 (citing *Tienda v. State*, 358 S.W.3d 633 (Tex. Crim App. 2012). Though case law from other jurisdictions is not binding upon this court, we, like the *Kent* court, find *Vayner* and *Smith*'s commentary instructive here.

¶ 46    Here, we find that the Facebook records were not duly authenticated. The State did not link the name "DoDe Lewis" to defendant. This is not defendant's name and there was no indication that there was a photograph associated with the profile that resembled defendant. The State also failed to elicit any testimony from Powell regarding why she believed defendant sent the messages. In fact, the State actually elicited testimony that defendant has multiple Facebook accounts, underscoring that proper authentication is essential. There was no evidence that these messages were sent from a device (computer or otherwise) associated with defendant, and there was no testimony that someone had seen defendant send these messages to Powell from that account. The information contained in the messages, namely that defendant and Powell had a son together, that he owed child support, Powell's birthdate, and that his mother was moving soon, was not so obscure or personal that it could not have been known by other individuals. Moreover, the State failed to elicit any testimony from Powell that this information was only known to her and defendant. Finally, the State specifically pointed out that some of the messages were sent on the day of the subject incident and the messages alluded to defendant attacking Powell; however, almost all the messages contained similar insinuations or even direct statements of killing Powell and defendant did not attack Powell on any of these other days. Thus, the significance of the message sent on the date of this incident is diminished.

¶ 47    In contrast, emails purportedly sent by the defendant *were* properly authenticated in *Downin*, 357 Ill. App. 3d 193, 194 (2005). There, the defendant was charged with several counts of aggravated criminal sexual abuse, and the State presented an exchange of emails between the minor and the defendant discussing their sexual relationship. *Id.* at 194, 196. On appeal, the defendant argued that the emails were not properly authenticated, but the appellate court disagreed, pointing to the minor's testimony that she communicated with the defendant

at the same email address many times and that the emails contained information only she and defendant would know. *Id.* at 202, 203. We have no such testimony in this case. The State wholly failed to elicit any specific testimony from Powell as to how she knew it was defendant that was sending her messages from the Facebook account of DoDe Lewis.

¶ 48    Because we have found that the trial court erred in admitting the Facebook messages, we now turn to the next step of plain-error analysis. Defendant contends that we should reverse his conviction under the first prong of the plain error doctrine because the evidence at trial was closely balanced. "An error is prejudicial because it occurred in a close case where its impact on the result was potentially dispositive." *People v. Lee*, 2019 IL App (1st) 162563, ¶ 67 (citing *People v. Sebby*, 2017 IL 119445, ¶ 68). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 49    Defendant argues that the evidence of strangulation, an element needed to be proved on the charge of aggravated domestic battery, was closely balanced such that the Facebook messages influenced the court of defendant's "extreme" intent to commit violence against Powell. We, however, agree with the State that the evidence was not closely balanced.

¶ 50    The offense of aggravated domestic battery, as charged herein, required the State to prove that defendant, in committing a domestic battery, strangled Powell. 720 ILCS 5/12-3.3(a-5) (West 2014). In this context, "strangle" means to intentionally impede the normal breathing or circulation of an individual by applying pressure to the throat or neck. *Id.* "Domestic battery," as is relevant here, occurs where a person causes bodily harm to or makes physical contact of an insulting or provoking nature with a spouse. 720 ILCS 5/12-3.2(a)(1), (2) (West 2014); 720

ILCS 5/12-0.1 (West 2014). We note that the only issue actually being contested in regards to this offense is the element of strangulation. Defendant admitted to law enforcement that he attacked Powell.

¶ 51    The record shows that, although Powell testified at trial that she did not remember defendant choking her, she made multiple statements to law enforcement and paramedics at the time of the incident that he had done so.  There was also a written statement from the day of the incident stating that defendant choked her. Blind, as an eyewitness, also informed law enforcement that he observed defendant choke Powell. Finally, Powell's statements are corroborated by the photographs taken that day showing red marks on her neck from which the court could reasonably infer that defendant had grabbed her neck. Our assessment of the evidence demonstrates that it was not closely balanced. Accordingly, defendant is not entitled to relief under the plain error doctrine.

¶ 52                    2. Admissibility of Prior Domestic Violence Incidents

¶ 53                              A. Trial Court Error

¶ 54    Next, defendant contends that the trial court erred in allowing the State to elicit testimony regarding the hospital incident where the court had failed to rule on its admissibility prior to trial. Again, defendant concedes that this issue was not preserved and requests that this court review it under the plain-error doctrine.

¶ 55    "Evidence of other offenses is admissible if it is relevant for any purpose other than to show the defendant's disposition or propensity to commit the crime charge, including *modus operandi*, intent, identity, motive, or absence of mistake. *People v. Chromik*, 408 Ill. App. 3d 1028, 1041 (2011). However, the proscription against the introduction of prior bad acts evidence to establish propensity was, at least in part, abrogated by Section 115-7.4 of the

Illinois Code of Criminal Procedure. *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010). That section allows a prior incident of domestic violence to be "considered of its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4 (West 2014). Thus, prior instances of domestic violence are admissible under Section 115-7.4 so long as it is relevant and not substantially more prejudicial than probative. *Dabbs*, 239 Ill. 2d at 291. When weighing the probative value and prejudicial effect of such evidence, courts should consider the proximity in time to the charged offense, the degree of factual similarity to the charged offense, or other relevant facts and circumstances. 725 ILCS 5/115-7.4(b). Though the trial court's decision to admit or deny such evidence of domestic violence is reviewed for abuse of discretion (*People v. Heller*, 2017 IL App (4th) 140658, ¶ 55), whether the trial court applied the proper standard is reviewed *de novo* (*People v. Cameron*, 2012 IL App (3d) 110020, ¶ 26). As we are evaluating defendant's claim under plain error, we must first determine whether the trial court erred in admitting this evidence.

¶ 56 Here, the State included the hospital incident in its written motion *in limine*; however, the incident was not discussed at the hearing on the motion on June 21, 2016. Only the incident in Kansas was discussed. The court ultimately allowed the State to introduce "this evidence" in their case-in-chief because it occurred only a year prior and showed context.

¶ 57 In *People v. Abernathy*, 402 Ill. App. 3d 726 (2010), the defendant argued on appeal that the trial court failed to conduct the requisite balancing test before admitting evidence under section 115-7.4. Though the the trial court did not explicitly mention the balancing test prior to admitting evidence, this court found that the trial court implicitly engaged in the balancing analysis where "the court noted that it was going to require the State to present the specific

evidence that it intended to introduce at trial in order for the court to 'weigh that against what prejudicial effect it might have upon the defendant.' " *Id.* at 750.

¶ 58        Similarly, the defendant in *People v. Boyd*, 366 Ill App. 3d 84, 90 (2006), argued on appeal that the trial court failed to conduct the balancing test prior to admitting other-crimes evidence under section 115-7.3 (a nearly identical provision regarding sex crimes). This court found that the record clearly showed that the trial court analyzed the probative value of the evidence but "never mentioned the risk of unfair prejudice." *Id.* at 94. We found that that was error, but ultimately determined that the trial court's failure to conduct the balancing test was harmless. *Id.* at 95.

¶ 59        Our review of the record shows that at no point was the hospital incident discussed, and we cannot infer from any of the statements at that hearing that the hospital incident was also being ruled upon. The trial court did not implicitly or explicitly conduct a balancing test as to the hospital incident. We recognize that "a reviewing court will ordinarily presume the trial judge followed the law unless the record indicates otherwise." *People v. Groel*, 2012 IL App (3d) 090595, ¶ 43 (citing *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996)). Here, the record does not indicate that the trial judge did not know the law. On the contrary, it shows that the trial judge clearly did know the law because he conducted the balancing test for the Kansas incident but it failed to conduct the same analysis for the hospital incident or to imply that it was coming to the same conclusion for the hospital incident. Therefore, we find that the court erred in admitting evidence of the hospital evidence at trial.

¶ 60        However, our analysis does not end there. The second step of plain-error analysis requires us to consider, once again, whether the evidence was closely balanced such that this error would tip the scales of justice against defendant. We must conduct "a commonsense analysis

of all the evidence in context" under this prong of the plain-error doctrine. *People v. Belknap*, 2014 IL 117094, ¶ 50.

¶ 61    In this case, the evidence was not closely balanced as to whether defendant committed aggravated domestic battery, which requires proof beyond a reasonable doubt that defendant strangled Powell. As previously stated, Powell told paramedics and law enforcement on the day of the incident that defendant had choked her, even though she testified at trial that she does not remember defendant choking her. The trial court specifically relied on Powell's day-of statements in finding defendant guilty of aggravated domestic battery. There was also a photograph taken that day that shows red marks on her neck, evidencing that she was grabbed on the neck, and Blind's eyewitness statement to law enforcement that he observed defendant choke Powell. Taken as a whole, the evidence at trial was not close as to defendant's strangulation of Powell.

¶ 62    We also point out that the hospital incident did not involve defendant choking Powell. Although it provided context for the court's understanding that defendant has previously attacked Powell, it did not provide any specific context as to his penchant for choking Powell. Thus, the testimony of this incident was unlikely to tip the scales of justice against the defendant. Moreover, the trial court, as the trier of fact in this case, did not mention the hospital incident in finding defendant guilty. Accordingly, we do not find the evidence closely balanced and plain-error review is unavailable to defendant here.

¶ 63                                B. Ineffective Assistance of Counsel

¶ 64    Defendant also argues that trial counsel was ineffective in failing to object to Powell's testimony regarding the hospital incident for the same reason as above. He further contends

that there is no reasonable trial strategy behind failing to object to a witness testifying about a prior incident of domestic violence where the court had not ruled on its admissibility.

¶ 65    The standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984), governs claims of ineffective assistance of counsel. To establish such a claim, a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010).

¶ 66    Under the first prong, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *People v. Ramirez*, 2018 IL App (1st) 152125, ¶¶ 15-16. There is a strong presumption that counsel's performance fell within a wide range of reasonable assistance. *Strickland*, 466 U.S. at 690.

¶ 67    The second prong requires that the defendant establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding arguably would have been different." *Strickland*, 466 U.S. at 694. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of [the proceedings] unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 68    Defendant is required to prove both prongs for an ineffective assistance of counsel claim to succeed. We find that he is unable to prove prejudice here. As we mentioned above, the trial court did not mention the hospital incident in finding defendant guilty and the hospital incident did not involve defendant choking Powell, rendering it less weighty evidence. Even if counsel had objected to Powell's testimony regarding the incident, there was still sufficient evidence

to find guilty of aggravated domestic battery beyond a reasonable doubt. Accordingly, defendant's claim of ineffective assistant of counsel fails.

¶ 69                                    III. CONCLUSION

¶ 70         For the reasons stated, we affirm the judgment of the circuit court.

¶ 71         Affirmed.